MARTHA M. HEATH, The. See Case No. 7,-113.

---

## Case No. 9,148.

### The MARTHA WASHINGTON.

[3 Ware, 245.][1]

District Court, D. Maine. Jan. 10, 1860.[2]

SHIPPING — POSSESSION OF VESSEL — MAJORITY IN OWNERSHIP—TRANSFER—ACT OF CONGRESS.

1. The constitutional power of congress to pass the law of 1850, § 1 [9 Stat. 440], relative to recording the transfer of vessels, raised but not decided.

2. A court of admiralty has no jurisdiction to decree possession of a vessel to the owners of a majority, when a title to such vessel is set up in mortgage.

This case came up on an agreed statement of facts, about which there was no dispute, and the principal point argued was the validity of the law of the United States of 1850 (section 1). It was to obtain a decision on this point, on which there were conflicting opinions, that the suit was brought. The court thought itself obliged to decide it on a narrower ground.

Shepley & Dana, for libellants.
Fessenden & Butler, for respondent.

WARE, District Judge. This is a libel against the Martha Washington, a brig of about 270 tons burthen, by Blanchard and Sherman claiming 5-16 in full title. In an agreed statement of facts it is admitted that she was built in 1853, at Surry, in the collections district of Frenchman's Bay, within which all the owners resided, and, on the 5th of December, she was registered in that district. On the 25th of October, 1855, she surrendered her registry and was enrolled. On the 7th of December, 1855, being at Norfolk, and desirous to make a voyage to the West

1 [Reported by George F. Emery, Esq.]
2 [Affirmed in Case No. 1,513.]

Indies, she surrendered her papers and took out a temporary register in that office, and under that register was employed during the whole of 1856 and the greater part of the year 1857. The libellants claim title to one-half of the brig by virtue of a mortgage of Wm. Coggin, dated Nov. 21, 1856, recorded in the collector's office at Frenchman's Bay, Nov. 27, 1856, and at Norfolk, May 11, 1857, and by the clerk of the town of Surry, Nov. 18, 1857. To this title of the libellants, Phebe Flood has put in a claim to three-sixteenths which is derived from a mortgage of the said Coggin, dated April 1, 1856, and recorded in the collector's office in Frenchman's Bay, Sept. 1, 1856. Amos D. Dolivar has put in another claim to one-sixteenth by a mortgage of the same Coggin, dated Sept. 1, 1856, and recorded the second day of the same month in the collector's office at Ellsworth. Coggin, it is admitted, owned one-half and no more of the brig. Of this he conveyed one-half by two mortgages to Flood & Dolivar, both of them of earlier date and record, in the office of the collector at Frenchman's Bay, than the libellants, but neither recorded in the office of the clerk of Surry. He then conveyed the whole of his half to the libellants, who had their mortgage recorded in the office of the collector of Norfolk, and with the clerk of the town of Surry. Coggin had his residence at Surry till the time of his death.

The libellants claim possession on the ground of title to a majority of the vessel, and to one-half, their title is a foreclosed mortgage under the revised statutes of Maine. The words of the law are: "No mortgage of personal property made to secure the payment of more than thirty dollars shall be valid against any other person than the parties thereto, unless possession of such property is delivered and retained by the mortgagee, or the mortgage be recorded by the clerk of the town in which the mortgagee resides." Chapter 91, § 1. The third section provides that the property may be redeemed at any time within sixty days after the breach of the condition. That time had elapsed before the filing of the libel, and the parties claim an absolute foreclosure by operation of law. To this libel answers are interposed by Flood and Dolivar, claiming title, one to three-sixteenths and the other one-sixteenth parts of the same vessel, on mortgage prior in point of date of the conveyances and of the record in the collector's office at Frenchman's Bay, to that of the libellant. Their claim is under the United States statute of 1850 (section 1). The words of this statute are "that no bill of sale, mortgage, hypothecation, or conveyance of any vessel or part of any vessel of the United States, shall be valid against any person other than the grantor or mortgagee, his heirs and devisees and persons having actual notice thereof; unless such bill of sale, mortgage, hypothecation, or conveyance be recorded in the office of the collector of the customs where such vessel is registered or

enrolled." In both statutes there is a reservation of bottomry contracts and implied liens, which it is immaterial to consider in this case. It may here be remarked, that though the law of the state was enacted in the revised statutes in 1857, it was but a re-enactment of the law of the state dated back to 1839.

On these mortgages the libellants shew a good title under the state law, and the claimants under that of the United States. If these two laws had proceeded from the same authority, that is, if both had been enacted by the same sovereign power, but little difficulty, I think, would be found in holding that of the United States an implied repeal of the state law, and that a compliance with the terms of both would be unnecessary. There appears to me to be a real difficulty in yielding to the authority of the case of Thompson v. Van Vechten, 5 Abb. Prac. 462, which was quoted at the argument, that to secure a mortgage, the mortgagee must record under both laws. Both provide for the same case, they cover the whole matter and they have the same penal sanction, that is, the nullity of the conveyance if the terms of the law are not complied with. They appear to me to fall under the common rule, that a subsequent law, relating to the same matter, is a repeal of a prior, so far as the provisions of the two are repugnant or inconsistent, and if the second covers the whole matter of the first, it is a repeal of that in toto. And it is so plain a principle of the constitution and has been so often recognized, that in all matters to which the authority of the United States extends, their laws are paramount to those of a state, that it seems superfluous to refer to any authority on this point.

If this be correct the rights of the parties under these mortgages must be decided by the United States law, if it is in force. It is so if congress had the constitutional right to pass it, for it has not been repealed. This brings up the point that was mainly, I may say solely, relied on at the argument, that the act of 1850 is purely void from excess of power; that congress, in enacting this law, passed their constitutional limits, and the act is therefore a pure nullity.

If congress has the power to pass laws regulating the title to vessels generally, it must be derived from the grant of power in the first article (section 8): "To regulate commerce with foreign nations, and among the several states, and with the Indian tribes." The clause at the end of this section, "To make all laws which shall be necessary and proper for carrying into execution the foregoing powers," &c., it has always appeared to me cannot enlarge the powers of the general government, because this refers only to incidental powers, which would necessarily follow the grant of the general power without express words. If it did increase their power, it would be neutralized by the tenth amendment. This provides that "the powers not delegated the United States by the constitution, nor prohibited by it to the states, are reserved to the states respectively or to the people." This is a complete negation of a constructive power on the clause, which I have mentioned.

The grant of power to regulate commerce, it is admitted, includes that of regulating navigation, but it includes it as an incident merely. Congress has the right to regulate foreign navigation so far as it is engaged in carrying on our commerce. Yet no one would contend that they had a general power over vessels belonging to a foreign nation. So congress has the power to regulate ships or vessels just so far and no farther than as they are employed in carrying on trade. There can be no doubt that, under state laws, any one may own a vehicle made of wood, iron, and copper in any form, whether in that of a ship, a barrel, or a box, and may transfer it under what conditions he pleases without reference to the United States laws. It is only when it becomes a vehicle in carrying on trade that it comes within the reach of the United States authority. And whatever may be the form, there can be no doubt that the United States, so far as it is used in trade and commerce, may regulate the transfer and the title generally; that is, so far as it is used in foreign and inter-state trade and trade with the Indians. To this limit was the power of congress carefully confined by the supreme court in the great case of Gibbons v. Ogden, 9 Wheat. [22 U. S.] 1, 197. Under this power congress may order ships or vessels to be registered and enrolled, to be commanded and manned in a particular way, to be under a peculiar police adapted to the service, and be recorded in the custom-house, or they shall have none of the privileges and immunities attached to United States vessels. But the penalty by which this law is enforced must be confined to these privileges. The power of the United States must be restricted to taking away that which the United States can give. The laws of the Union never contemplate vessels as property simply, but as property employed in a particular way, or for a particular purpose. The tenure of all goods in civilized society is fixed by law. As property, the owner holds it under state laws. It is only as engaged in trade, that they hold it under United States law. What the state gives, the United States cannot take away. But the privilege of engaging in a certain trade is given by the United States, and of that vessels, like any other property, may be deprived.

If the authority contended for were allowed it would, in principle, go somewhat farther than is at first imagined. The only ground on which it can be pretended that the United States can regulate the mode of transfer of vessels, is that they may be, and most usually are, used in carrying on trade. But if for this reason alone they may regulate the title generally, I do not see but that with the

same force it may be applied to barrels and boxes, nay, to wagons, carts, and horses, because they may be used in carrying on interstate and Indian trade. A cooper or a pedlar would be surprised to be informed that they could not convey a title to a barrel or a wagon without first consulting the United States laws.

It will not be pretended that a decision against the validity of the law of the United States, or one that should restrict its operation to the immunities granted by their laws, would not be attended with difficulties of the gravest character. There can be no doubt that they can regulate the transfer of vessels so far that they shall have none of the privileges granted by them, unless by a compliance with their laws. In this way only, can vessels be entitled to engage in the public trade, and without these privileges, they would be of little value, while other vehicles derive little of their value from this privilege, as barrels, boxes, carriages, etc. And there would be a real and substantial difficulty in separating the immunities from the thing itself, and allowing these to be transferred independent of the thing itself.

The question raised in this case is one of the greatest importance, as it affects the powers of the general government and of the separate states, as well as the commercial community at large. And it will require very grave consideration before it is decided either way. As property generally, the owners hold vessels as they do all other property under state laws. It is not perceived how, in this case, the United States can take away, in the form of a penalty, what they cannot give. This power of control is not expressly granted by the constitution. That of regulating navigation, so far as it is engaged in trade, is but an incident, and to allow the United States a general control over the transfer of vessels, when their own interests are not concerned, would be grafting an incident on an incident. For it will not be pretended that congress have this power because the public good would be promoted by having it lodged within them. If the plea of utility, of which, from the necessity of the case, the general government would alone be the judge, were sufficient, ours would be a government of discretion and not of fixed rules. And it is an elementary principle of law, that when one acts under a delegated authority he must show it to exist either by express grant or necessarily incident to some express grant, or it does not exist. The supreme court, in one of the most carefully considered opinions ever delivered in that court, have given this construction to the constitution. Martin v. Hunter, 1 Wheat. [14 U. S.] 326–349. The constitution is to be interpreted like every other grant of power. See 1 Pars. Mar. Law, pp. 47–51.

If it were necessary to decide this question on this case, I should desire a longer time to consider it. Every question involving the constitutional power of the general government is important, and there can be scarcely any one more so than this. Within the grant of the constitution the power of the general government is supreme, and overcomes all state legislation, but beyond that its acts are merely void. The conveyance of vessels is of daily occurrence, and it is of the last importance to ship owners when the laws are in conflict, to know whether they are to obey those of the state, or the United States. Although this question must be decided, I think it cannot be in the present case, and the courts of the United States are not in the habit of volunteering their opinions when they are not called for. Sufficient for the day are the evils and trials which the day brings. My opinion is that the case must be determined on the question of jurisdiction, and, as this is preliminary in its nature, it cuts off all questions which arise on the merits.

The title set up by this libel is founded on a mortgage, and the prayer is for possession. It is not pretended that the plaintiffs owned a majority independent of the mortgage. Without a majority they would have no right to claim possession against other co-tenants, and the transfer of the possession must have its foundation in that title. In the case of Boghart v. The John Jay, 17 How. [58 U. S.] 399, the supreme court held that the court of admiralty had no jurisdiction to decree a sale of a ship to pay an unsatisfied mortgage or to transfer the possession to the mortgagees. This case was confirmed in that of Schuhardt v. The Angelique, 19 How. [60 U. S.] 239. It was acted on in that of The William D. Rice [Case No. 17,691]. It is on the ground that the title set up is essentially one in equity, and though a court of admiralty professes to decide ux aequo et bono, on the general principles of equity, it has none of the peculiar powers of that court in the investigation of the title and the equities under it. How far a court of admiralty may look into a mortgage when it comes up collaterally, is another question; but when this lies at the very foundation of the case, it is too well settled in this country, as, before the statute of Victoria, it was in England, that the court looks only at the legal title, to be brought into doubt. It is equally clear that the consent of parties cannot give jurisdiction. If this defect appears at any time in the course of the trial, although not raised by the pleadings of the parties, it is fatal. So it has often been decided by the supreme court.

The libel dismissed with costs.

The decree of the district court was affirmed by the circuit court at Sept. term, 1860. Blanchard v. The Martha Washington [Case No. 1,513].

MARTHA WASHINGTON, The. See Case No. 1,513.

MARTHA WASHINGTON, The (BLANCHARD v.). See Case No. 1,513.