## DETROIT TRUST CO., TRUSTEE, *v.* THE THOMAS BARLUM ET AL.*

No. 13. Argued October 12, 1934.—Decided November 5, 1934.

---

*Together with No. 14, *Detroit Trust Co., Trustee,* v. *The John J. Barlum et al.,* certiorari to the Circuit Court of Appeals for the Second Circuit.

22

*Mr. Ray M. Stanley,* with whom *Messrs. Ellis H. Gidley, Ferris D. Stone,* and *Cleveland Thurber* were on the brief, for petitioner.

24

*Mr. George E. Brand,* with whom *Mr. Thomas C. Burke* was on the brief, for respondents.

26

28

Mr. Chief Justice Hughes delivered the opinion of the Court.

These are suits in admiralty to foreclose two mortgages given by the Barlum Steamship Company upon the vessels "Thomas Barlum" and "John J. Barlum," respectively. The mortgages purported to be preferred mortgages under the Ship Mortgage Act, 1920. 41 Stat. 1000–1006; 46 U. S. C., c. 25, §§ 911–984. The mortgagor, appearing as claimant, contended that the admiralty was without jurisdiction. The District Court overruled that contention and, finding that all the requirements of that Act had been met, entered decrees of foreclosure and sale. 56 F. (2d) 455; 2 F. Supp. 733. In the case of the "John J. Barlum" the decree provided for the recovery by certain seamen, intervening libelants, of amounts due for wages, as preferred maritime liens. The Circuit Court of Appeals reversed the decrees, holding that the suits should have been dismissed for the want of jurisdiction. 68 F. (2d) 946. This Court granted certiorari. 292 U. S. 619.

The mortgagor at the time the mortgages were executed, was a close corporation, about four-fifths of its shares being owned by John J. Barlum who was also interested in several non-maritime enterprises. The mortgage, in No. 13, on the "Thomas Barlum" was executed in March, 1929, to petitioner, as trustee, to secure $200,000 of bonds which were purchased by petitioner with a definite understanding as to the application of the proceeds. Approximately $50,000 were to meet obligations secured by a prior mortgage upon the same vessel; about $100,000 were to take up loans of John J. Barlum and Thomas Barlum & Sons, a concern which was engaged in a non-maritime enterprise; and the remainder, about $42,000, were to provide for repairs and for refitting the vessels "Thomas Barlum" and "John J. Barlum." The mort-

gage was executed while the " Thomas Barlum " was laid up.

The mortgage, in No. 14, on the " John J. Barlum " was executed in December, 1927, to petitioner, as trustee, to secure an issue of $200,000 of bonds purchased by petitioner with the understanding that, of the proceeds, petitioner was to retain about $82,000 to cover principal and interest on bonds of John J. Barlum secured by a mortgage on real estate, and about $10,000 to be applied on one of his notes. Most of the remaining proceeds, which were paid over to the mortgagor, was used to take up loans in connection with non-maritime enterprises, only a small part being devoted to payments relating to the operation of the vessels.

In both instances, the bonds secured by the mortgages were negotiable bonds and were purchased by petitioner for sale to the general public and were largely so sold.

There is no question as to the validity of the mortgages or of the bonds which they secure or as to the default in payment. The question is solely one of jurisdiction in admiralty of the foreclosure suits. Respondent contends that the mortgages " were so devoid of connection with maritime purposes " that the provision of the Ship Mortgage Act conferring jurisdiction in admiralty " either does not, or cannot constitutionally, apply."

The Circuit Court of Appeals was divided in opinion. The majority of the judges, without passing on the extent of congressional authority, thought that it was sufficient to point out that the mortgagor and mortgagee knew, before the mortgages were made, that the moneys advanced " were intended for and actually were used for non-maritime purposes," and they concluded that the provisions of the Ship Mortgage Act did not extend to such a case. The minority view, supporting the decision of the District Court, was that the Congress intended to encourage the investment of capital in ships; that it

might well be that this object could best be promoted by allowing vessels " to be hypothecated as readily and with the same effect as other personal property "; that a mortgage on a ship would be " a most undesirable security " if purchasers of bonds so secured must at their peril ascertain how moneys advanced upon the mortgage are to be spent; and that Congress had constitutional authority to give to a valid mortgage a preferred status, and to provide for the enforcement of the lien in admiralty, by virtue of its control over ships as essentially marine instrumentalities, a control which includes the promotion of their development and the regulation of their use.

Prior to the enactment of the Ship Mortgage Act, 1920, the admiralty had no jurisdiction of a suit to foreclose a mortgage on a ship. *Bogart* v. *The Steamboat John Jay,* 17 How. 399; *Schuchardt* v. *Ship Angelique,* 19 How. 239, 241; *People's Ferry Co.* v. *Beers,* 20 How. 393, 400; *The Lottawanna,* 21 Wall. 558, 583; *The Eclipse,* 135 U. S. 599, 608; *The J. E. Rumbell,* 148 U. S. 1, 15.[1] If jurisdiction in the admiralty of the present suits is to be maintained it must be by reason of the application and validity of the provisions of the Ship Mortgage Act.

■ *The application of the statute.* The grant of jurisdiction is found in subsection K (46 U. S. C. 951) which provides:

"A preferred mortgage shall constitute a lien upon the mortgaged vessel in the amount of the outstanding mortgage indebtedness secured by such vessel. Upon the default of any term or condition of the mortgage, such lien may be enforced by the mortgagee by suit in rem in ad-

---

[1] See, also, *The William D. Rice,* 3 Ware 134, 136; *The Martha Washington,* 3 Ware 245, 251; *The Sailor Prince,* 1 Ben. 461, 466; *Morgan* v. *Tapscott,* 5 Ben. 252; *Britton* v. *The Venture,* 21 Fed. 928; *The Gordon Campbell,* 131 Fed. 963, 965; *The Clifton,* 143 Fed. 460, 463; *The Conveyor,* 147 Fed. 586, 589; *The Rupert City,* 213 Fed. 263, 266.

miralty. Original jurisdiction of all such suits is granted
to the district courts of the United States exclusively."

The grant is thus one of exclusive jurisdiction to en-
force the lien of a " preferred mortgage." If the mort-
gage is a preferred mortgage within the definition of the
Act, jurisdiction is granted; otherwise not. " Preferred
mortgages " are carefully defined in the detailed pro-
visions of subsection D.[2]  46 U. S. C. 922.  The applica-

---

[2] Subsection D is as follows: "*Preferred Mortgages.* (a) A valid
mortgage which, at the time it is made includes the whole of any
vessel of the United States of 200 gross tons and upward, shall in
addition have, in respect to such vessel and as of the date of the
compliance with all the provisions of this subdivision, the preferred
status given by the provisions of subsection M, section 953, if—

"(1) The mortgage is indorsed upon the vessel's documents in
accordance with the provisions of this chapter;

"(2) The mortgage is recorded as provided in subsection C, sec-
tion 921, together with the time and date when the mortgage is so
endorsed;

"(3) An affidavit is filed with the record of such mortgage to the
effect that the mortgage is made in good faith and without any
design to hinder, delay, or defraud any existing or future creditor
of the mortgagor or any lienor of the mortgaged vessel;

"(4) The mortgage does not stipulate that the mortgagee waives
the preferred status thereof; and

"(5) The mortgagee is a citizen of the United States.

"(b) Any mortgage which complies in respect to any vessel with
the conditions enumerated in this subsection is hereafter in this
chapter called a 'preferred mortgage' as to such vessel.

"(c) There shall be indorsed upon the documents of a vessel
covered by a preferred mortgage—

"(1) The names of the mortgagor and mortgagee;

"(2) The time and date the indorsement is made;

"(3) The amount and date of maturity of the mortgage; and

"(4) Any amount required to be indorsed by the provisions of
subdivision (e) or (f) of this subsection.

"(d) Such indorsement shall be made (1) by the collector of
customs of the port of documentation of the mortgaged vessel, or
(2) by the collector of customs of any port in which the vessel is
found, if such collector is directed to make the indorsement by the

tion of this term in the subsequent provisions of the Act, including the provision as to admiralty jurisdiction, is not left to inference but is explicitly stated in subdivision (b) of subsection D as follows:

"Any mortgage which complies in respect to any vessel with the conditions enumerated in this subsection is hereafter in this chapter called a 'preferred mortgage' as to such vessel."

Subdivision (a) of subsection D provides that a "valid mortgage," which "includes the whole of any vessel of the United States of 200 gross tons and upward," shall have, in addition, "in respect to such vessel and as of the date of the compliance with all the provisions of this

---

collector of customs of the port of documentation; and no clearance shall be issued to the vessel until such indorsement is made. The collector of customs of the port of documentation shall give such direction by wire or letter at the request of the mortgagee and upon the tender of the cost of communication of such direction. Whenever any new document is issued for the vessel, such indorsement shall be transferred to and indorsed upon the new document by the collector of customs.

"(e) A mortgage which includes property other than a vessel shall not be held a preferred mortgage unless the mortgage provides for the separate discharge of such property by the payment of a specified portion of the mortgage indebtedness. If a preferred mortgage so provides for the separate discharge, the amount of the portion of such payment shall be indorsed upon the documents of the vessel.

"(f) If a preferred mortgage includes more than one vessel and provides for the separate discharge of each vessel by the payment of a portion of the mortgage indebtedness, the amount of such portion of such payment shall be indorsed upon the documents of the vessel. In case such mortgage does not provide for the separate discharge of a vessel and the vessel is to be sold upon the order of a district court of the United States in a suit in rem in admiralty, the court shall determine the portion of the mortgage indebtedness increased by 20 per centum (1) which, in the opinion of the court, the approximate value of the vessel bears to the approximate value of all the vessels covered by the mortgage, and (2) upon the payment of which the vessel shall be discharged from the mortgage."

subdivision, the preferred status given by the provisions of subsection M," [3] 46 U. S. C. 953. The term " vessel of the United States " means any vessel documented under the laws of the United States; and, in the case of a mortgage " involving a trust deed and a bond issue thereunder," the term " mortgagee " means the trustee. Subsection B, 46 U. S. C. 911. The " preferred status " given by subsection M is that, on foreclosure and sale in admiralty, all preëxisting claims in the vessel are to be held terminated and thereafter are to attach to the proceeds of the sale, and the " preferred mortgage lien " is to have priority over all claims against the vessel, except " preferred maritime liens " and expenses, fees and costs allowed by the Court. " Preferred maritime liens " are those arising prior to the recording and indorsement of the mortgage as required, or " a lien for damages arising out of tort, for wages of a stevedore when employed directly by the owner, operator, master, ship's husband, or

---

[3] Subsection M is as follows: " *Preferred Maritime Lien; Priorities; Other Liens.* (a) When used hereinafter in this chapter, the term ' preferred maritime lien ' means (1) a lien arising prior in time to the recording and indorsement of a preferred mortgage in accordance with the provisions of this chapter; or (2) a lien for damages arising out of tort, for wages of a stevedore when employed directly by the owner, operator, master, ship's husband, or agent of the vessel, for wages of the crew of the vessel, for general average, and for salvage, including contract salvage.

"(b) Upon the sale of any mortgaged vessel by order of a district court of the United States in any suit in rem in admiralty for the enforcement of a preferred mortgage lien thereon, all preëxisting claims in the vessel, including any possessory common-law lien of which a lienor is deprived under the provisions of subsection L, section 952, shall be held terminated and shall thereafter attach, in like amount and in accordance with their respective priorities, to the proceeds of the sale; except that the preferred mortgage lien shall have priority over all claims against the vessel, except (1) preferred maritime liens, and (2) expenses and fees allowed and costs taxed, by the court."

agent of the vessel, for wages of the crew of the vessel, for general average, and for salvage, including contract salvage."

The requirements of subdivision (a) of subsection D, which must be met in order to obtain this preferred status, are that the mortgage shall be indorsed upon the vessel's documents and shall be recorded; that an affidavit shall be filed with the record " to the effect that the mortgage is made in good faith and without any design to hinder, delay or defraud any existing or future creditor of the mortgagor or any lienor of the mortgaged vessel "; that the mortgage does not stipulate for a waiver of the preferred status; and that the mortgagee is a citizen of the United States. Subdivisions (c) and (d) of subsection D set forth the nature and manner of the required indorsement upon the documents of the vessel; and subsection C (46 U. S. C. 921), to which subsection D refers, contains detailed provisions as to recording.

Subdivision (e) of subsection D provides that a mortgage which includes property other than a vessel " shall not be held a preferred mortgage " unless there is provision for the separate discharge of such property by the payment of a specified portion of the mortgage indebtedness; subdivision (f) of subsection D makes provision for the case of a mortgage covering more than one vessel. And where a mortgage covers property in addition to vessels, the Act is not to be construed as authorizing a proceeding *in rem* in admiralty to enforce the rights of the mortgagee in respect to such property. Subsection N,[4] 46 U. S. C. 954.

---

[4] Subdivision (b) of subsection N is as follows: "(b) This chapter shall not be construed, in the case of a mortgage covering, in addition to vessels, realty or personalty other than vessels, or both, to authorize the enforcement by suit in rem in admiralty of the rights of the mortgagee in respect to such realty or personalty other than vessels."

Subsection E (46 U. S. C. 923) imposes the duty upon the mortgagor to keep on board the mortgaged vessel a certified copy of the mortgage and to cause it and the vessel's documents to be exhibited by the master to any person having business with the vessel which may give rise to a maritime lien or to a transfer or mortgage of the vessel. Subsection F (46 U. S. C. 924) requires the mortgagor to disclose to the mortgagee, upon his request, the existence of any maritime lien, prior mortgage, or other obligation or liability of the vessel, that is known to the mortgagor, and prohibits the mortgagor, after the mortgage is executed and before the mortgagee has had reasonable time to record it and to have the necessary indorsements made upon the vessel's documents, from incurring " any contractual obligation creating a lien upon the vessel," other than those liens which are made " preferred maritime liens " as above stated. Provision is also made for the record of notices of claims of lien on the mortgaged vessel, for certificates of discharge of liens, and for the inspection of records and obtaining copies. Subsections G and I, 46 U. S. C. 925, 927. Penalties are provided for failure to exhibit documents and for violation of the Act in other respects; and provision is also made for recovery, by suits in the district courts of the United States, against collectors of customs and mortgagors, or masters of vessels, of damages caused by failure to perform the duties imposed upon them. Subsection J, 46 U. S. C. 941.

An examination of the provisions of the Act leaves no room for doubt that the subject of mortgages of vessels, and, in particular, the priority which should be assigned to them in relation to other liens, was under the close scrutiny of the Congress in determining its policy. But, among all the minute requirements of the Act, we find none as to the application of the proceeds of loans which such mortgages secure. No condition is imposed

as to the purposes for which the moneys are lent. While the Congress took care to make distinct provision for cases where a mortgage covers property other than a vessel, no distinction is made as to the status of mortgages of vessels by reason of an intention to devote the borrowed moneys to uses other than maritime. We are not at liberty to imply a condition which is opposed to the explicit terms of the statute. It is enough, so the statute says expressly, that the mortgage is upon a vessel of the United States, that it is a valid mortgage, that it is made in good faith, that it is disclosed by proper indorsements on the vessel's documents and is duly recorded, and that the other conditions, specified in detail, are met. Such a mortgage upon a vessel documented under the laws of the United States, the Congress has undertaken to regulate with respect to priority of lien. If the conditions so laid down are fulfilled, the mortgage is to be a "preferred mortgage" with all the incidents which the Act attaches to it, including the right to bring foreclosure in admiralty. To hold that a mortgage is not within the Act which the Act itself states is within it, is not to construe the Act but to amend it. The question of policy—whether different terms should have been imposed—is not for us. We may not add to the conditions set up by Congress any more than we can subtract from them. They stand, as defined, precise and complete.

We see nothing in the general purpose of the Act which can be deemed to restrict the natural meaning and effect of its language. Rather, the general purpose emphasizes that meaning and effect. The Ship Mortgage Act is a part of the Merchant Marine Act, 1920. 41 Stat. 988. Its declared purpose is "to provide for the promotion and maintenance of the American merchant marine." The Congress, in its wisdom, decided upon the means to achieve that object and set forth its conclusions in the terms of the statute. The legislative

history of the statute shows the controlling considerations. The report of the Senate Committee on Commerce pointed out that " mortgage security on ships " was " practically worthless "; that it was proposed to " make it good except as to certain demands that should be superior to everything else, such as wages "; and that it was desired to have " our people and capital interested in shipping and shipping securities." Sen. Rep. No. 573, 66th Cong., 2d sess., p. 9. The bill, with this purpose, was developed in conference. The managers on the part of the House of Representatives, in their statement accompanying the report of the Committee of Conference, observed that by the enlarged provisions of the bill " the mortgagee under a mortgage upon a vessel of the United States is made more secure in his interest in the vessel than he is under existing admiralty law," and, referring to the plan of " creating a preferred mortgage," added that " the preferred status arises upon the recording of the mortgage as a preferred mortgage and its indorsement upon vessel's documents." There is no suggestion of any requirement as to the use, intended or actual, of the moneys borrowed upon the faith of the mortgage security. H. R. No. 1102, 66th Cong., 2d sess., p. 34; H. R. No. 1107, 66th Cong., 2d sess., p. 31.[5] The measure was enacted in the terms thus proposed.

---

[5] In this statement, the House managers said: " This Senate amendment is an extensive provision by which the mortgagee under a mortgage upon a vessel of the United States is made more secure in his interest in the vessel than he is under existing admiralty law. The amendment supplements the existing mortgage recording provisions by creating a preferred mortgage which in foreclosure proceedings will have priority in the distribution of the proceeds from the sale of the mortgaged vessel over all maritime liens against the vessel except liens for damages arising out of tort, stevedores' and crews' wages, general average, and salvage. The preferred status arises upon the recording of the mortgage as a preferred mortgage and its indorsement upon vessel's documents. Under the Senate amend-

40

In placing ship mortgages upon a stronger basis as securities, the Congress had in mind, and expressly included, trust deeds securing issues of bonds to the public. Subsection B, 46 U. S. C. 911. It is plain that the fundamental purpose to promote public confidence in such securities, and their extended use as investments, would have been frustrated if purchasers of bonds had to discover at their peril the application of the proceeds of the secured loans, or if their rights depended upon such knowledge as their trustee might have, rather than upon the satisfaction of the statutory conditions and the disclosures, as required, by indorsement on the vessel's documents and recording. But, while contemplating such bond issues, with their obvious practical incidents, the Congress did not set up a special rule for them, or for purchasers of bonds without notice as to the application of proceeds. The Congress made simple, clear and definite conditions

ment the foreclosure proceedings are brought in the Federal courts in equity with simulated admiralty procedure under which the court in equity gives a title good against the world, and terminates all preexisting claims against the vessel. . . .

" The House recedes with an amendment which places the constitutional basis of Congress's power to legislate in respect to vessel mortgages, upon the grant of admiralty jurisdiction and the ' necessary and proper clause ' of the Constitution, instead of the power to regulate interstate and foreign commerce. The amendment as agreed to further places exclusive jurisdiction in the Federal courts to foreclose vessel mortgages upon the grant of admiralty jurisdiction instead of the provisions of the Constitution relating to diversity of citizenship and cases arising under the laws of the United States. The amendment as agreed to also makes the title granted under the order of a court of admiralty in the case of the libel of a vessel covered by a preferred mortgage good against the world as under the existing admiralty law and international admiralty practice; clarifies the provisions as to fleet mortgages; provides for the reënactment and incorporation in the amendment of the existing vessel mortgage recording provisions, and prevents the repeal of section 4 of the maritime lien act of 1910 in respect to the doctrines of advances and laches."

as to all ship mortgages otherwise valid, and when these were performed the mortgages were to have the status prescribed.

Given the standing of such mortgages in admiralty, which the Congress desired to establish, an omission of a provision as to the use of the moneys borrowed cannot be regarded as anomalous. An analogous principle has been recognized in relation to bottomry and respondentia bonds. Thus, in the case of bottomry bonds, if the conditions of the bottomry attach, such bonds when given by the owner of the vessel have been held to be within the admiralty jurisdiction even if they are given to secure non-maritime outlays. That view was emphatically stated by Justice Story in *The Draco*, 2 Sumn. 157. There, jurisdiction of the District Court, sitting in admiralty, was challenged upon the ground that the bond in question was not a " fit foundation for a proceeding *in rem*." *Id.*, p. 174. After a careful review of the historical conception of bottomry bonds, Justice Story concluded (*id.*, p. 186) : " In my opinion, there is not the slightest ground to uphold the doctrine, that, in order to constitute a bottomry bond, as such, in the sense of the maritime law, it is necessary that the money should be advanced for the necessities of the ship, or for the cargo, or for the voyage. Where it is given by the master, *virtute officii*, it must, in order to have validity, be for the ship's necessities; for the implied authority of the master extends no farther. But where it is given by the owner, as *dominus navis*, he may employ the money, as he pleases. It is sufficient, if the money be lent upon the bottom of the ship, at the risk of the lender, for the voyage." So, in the case of a respondentia loan, it is not necessary that it should be made before the departure of the ship on the voyage or that the money lent should be employed in the outfit of the vessel or invested in the goods on which the risk is run. It matters not, this Court

has said, at what time the loan is made, or upon what goods the risk is taken. " If the risk of the voyage be substantially and really taken," and the transaction be otherwise valid, "it is no objection to it, that it was made after the voyage was commenced, nor that the money was appropriated to purposes wholly unconnected with the voyage." The lender is not presumed to lend " upon the faith of any particular appropriation of the money." *Conard* v. *Atlantic Insurance Co.*, 1 Pet. 386, 437. See *Conard* v. *Nicoll*, 4 Pet. 291, 310; 3 Kent's Com., 361; note (e); *The Draco, supra,* pp. 188, 189.

It is also to be noted that the jurisdiction granted to the admiralty by the Ship Mortgage Act is exclusive. If a mortgage is within the Act, there can be no suit to foreclose it in a state court;[6] if the mortgage is not within the Act, there can be no suit for foreclosure in the admiralty. It cannot be doubted that the Congress recognized the importance of basing the jurisdiction, as thus sought to be conferred, upon precise statutory conditions. We find no warrant for leaving it to be tested by extrinsic criteria, raising a host of questions as to the application of the proceeds of loans, in the solution of which the statute affords no aid.

We conclude that the Court had jurisdiction of the suits provided the Congress had authority to grant it.

■ *The validity of the grant of jurisdiction.* The Congress rested its authority upon the constitutional provisions extending the judicial power " to all cases of admiralty and maritime jurisdiction " and conferring upon the Congress the power to make all laws which shall be " necessary and proper " for carrying into execution all powers " vested by this Constitution in the government of the United States, or in any department or officer thereof." Art. III, § 2; Art. I, § 8, par. 18.[7] This author-

<hr>

[6] See Note 5.          [7] See Note 5.

ity was not confined to the cases of admiralty and maritime jurisdiction in England when the Constitution was adopted. *Waring* v. *Clarke*, 5 How. 441, 457, 458. The limitations which had been imposed upon the high court of admiralty in the course of its controversy with the courts of common law were not read into the grant. But the grant presupposed a " general system of maritime law " which was familiar to the lawyers and statesmen of the country, and contemplated a body of law with uniform operation. *The Lottawanna,* 21 Wall. 558, 574, 575. The Constitution did not undertake to define the precise limits of that body of law or to lay down a criterion for drawing the boundary between maritime law and local law. *Id.* Boundaries were to be determined in the exercise of the judicial power in recognition of the purpose of the grant. " No state law can enlarge it, nor can an act of Congress or rule of court make it broader than the judicial power may determine to be its true limits." *The St. Lawrence,* 1 Black 522, 527. The framers of the Constitution did not contemplate that the maritime law should remain unalterable. The purpose was to place the entire subject, including its substantive as well as its procedural features, under national control. From the beginning the grant was regarded as implicitly investing legislative power for that purpose in the United States. When the Constitution was adopted, the existing maritime law became the law of the United States " subject to power in Congress to modify or supplement it as experience or changing conditions might require." *Panama Railroad Co.* v. *Johnson,* 264 U. S. 375, 385–387. The Congress thus has paramount power to determine the maritime law which shall prevail throughout the country. *The Lottawanna, supra,* p. 577; *Butler* v. *Boston & Savannah S. S. Co.,* 130 U. S. 527, 557; *In re Garnett,* 141 U. S. 1, 13; *Southern Pacific Co.* v. *Jensen,* 244 U. S. 205,

215; *Crowell* v. *Benson,* 285 U. S. 22, 39; *United States* v. *Flores,* 289 U. S. 137, 148, 149. But in amending and revising the maritime law, the Congress necessarily acts within a sphere restricted by the concept of the admiralty and maritime jurisdiction. *The Belfast,* 7 Wall. 624, 641; *Panama Railroad Co.* v. *Johnson, supra; Crowell* v. *Benson, supra,* p. 55.

The Congress began the exertion of this authority at an early date. In the Judiciary Act of 1789, the Congress conferred upon the district courts of the United States exclusive jurisdiction of all seizures under the laws of impost, navigation, or trade of the United States, where the seizures were made on navigable waters within the respective districts. § 9, 1 Stat. 76, 77. *Waring* v. *Clarke, supra,* p. 458; *The Margaret,* 9 Wheat. 421, 427. By the Act of June 19, 1813, 3 Stat. 2, the Congress declared that a vessel employed in a fishing voyage should be answerable for the fishermen's share of the fish caught, upon a contract made on land, in the same form and to the same effect as any other vessel is liable to be proceeded against for the wages of seamen. *Waring* v. *Clarke, supra.* Important illustrations of the exercise of congressional power are found in the Limitation of Liability Act of 1851, 9 Stat. 635, enacted for the purpose of encouraging investment in shipbuilding, by limiting the venture of shipowners to the loss of the ship itself, or her freight then pending, in cases of damage occasioned without the owner's privity or knowledge (*Norwich Co.* v. *Wright,* 13 Wall. 104; *Hartford Accident & Indemnity Co.* v. *Southern Pacific Co.,* 273 U. S. 207, 214); the extension, by the Act of June 26, 1884, § 18, 23 Stat. 57, 58, of the admiralty jurisdiction to proceedings for the limitation of liability, so as to include damages by a vessel to a land structure (*The Plymouth,* 3 Wall. 20; *Cleveland Terminal & V. R. Co.* v. *Steamship Co.,* 208 U. S. 316; *Richardson* v. *Harmon,* 222 U. S. 96, 101, 106); the Act of 1910, 36 Stat. 604,

providing for a maritime lien for repairs or supplies furnished to a vessel in her home port, to be enforced by a proceeding *in rem* (*The General Smith*, 4 Wheat. 438, 443; *The St. Jago de Cuba*, 9 Wheat. 409, 420; *The J. E. Rumbell*, 148 U. S. 1, 12; *Piedmont & G. C. Coal Co.* v. *Seaboard Fisheries Co.*, 254 U. S. 1, 11); the Act of March 30, 1920, 41 Stat. 537, providing for jurisdiction in admiralty of suits for damages from death caused by wrongful act and occurring on the high seas (*The Hamilton*, 207 U. S. 398; *Western Fuel Co.* v. *Garcia*, 257 U. S. 233, 243; *Lindgren* v. *United States*, 281 U. S. 38, 48); the Seamen's Act of 1915, § 20, 38 Stat. 1185 (*Chelentis* v. *Luckenbach Steamship Co.*, 247 U. S. 372, 384); the Merchant Marine Act of 1920, 41 Stat. 1007, amending § 20 of the Act of 1915, thus bringing, in relation to seamen, into the maritime law, rules drawn from the Federal Employers' Liability Act (*Panama Railroad Co.* v. *Johnson, supra; Engel* v. *Davenport*, 271 U. S. 33, 35; *Panama Railroad Co.* v. *Vasquez*, 271 U. S. 557, 559; *Northern Coal Co.* v. *Strand*, 278 U. S. 142, 147); and the Longshoremen's and Harbor Workers' Compensation Act of 1927, 44 Stat. 1424 (*Nogueira* v. *N. Y., N. H. & H. R. Co.*, 281 U. S. 128; *Crowell* v. *Benson, supra*).

Of special significance, in relation to the present question, are the Acts of 1884 and 1910, *supra*. By the former, the admiralty jurisdiction in limitation proceedings was enlarged so as to embrace the liability for a non-maritime tort. Although the damaged structure was on land, the injury was due to the operation of the vessel, and it could not be said that the Congress had stepped beyond the limits of its authority to amend the law in furthering its policy to encourage investments in ships. *Richardson* v. *Harmon, supra*. Compare *The Blackheath*, 195 U. S. 361, 367, 368. The Act of 1910 created a lien to be enforced *in rem* for repairs or supplies to vessels in their home ports. The state of the law as it existed be-

fore that enactment was fully described in *The J. E. Rumbell, supra*. For repairs or supplies furnished to a vessel in a foreign port, a lien was given by the general maritime law and could be enforced in admiralty, but for repairs or supplies in the home port, no lien existed, or could be enforced in admiralty under the general law, independently of local statute. When the statute of a State gave a lien to be enforced by process *in rem* against the vessel for repairs or supplies in her home port, that lien, being similar to the lien arising in a foreign port under the general law, was deemed to be in the nature of a maritime lien, and therefore could be enforced in admiralty, and, in such case the enforcement of the lien was within the exclusive jurisdiction of the courts of the United States sitting in admiralty. The result was that where necessaries were furnished to a vessel in her home port, the vessel could not be sued in the federal courts under the general maritime law, for that law was not deemed to confer a lien, and could not be sued in a state court, for that court could not enforce the lien created by the state law, but the lien so given might be enforced in admiralty.[8] The Act of 1910 abolished the artificial distinction between repairs and supplies in a home port and those in a foreign port. While it created a lien where in the absence of local provision therefor, none had theretofore existed, the change was not deemed to be inconsistent with the general principles of the maritime law and it effected a substitution of a single federal statute for the conflicting state statutes. *Piedmont & G. C. Coal Co.* v. *Seaboard Fisheries Co., supra*. The Act of 1910 also provided that it should not be necessary " to allege or prove " that credit was given to the vessel; previously, supplies furnished to the vessel at the home port, or on the owner's order, were presumed to be furnished upon his personal credit and created no lien. *Id.*

---

[8] See Benedict's Admiralty, 5th ed., §§ 87, 88.

Respondent, in attacking the grant of jurisdiction by the Ship Mortgage Act, relies strongly upon the reasoning of the Court in *Bogart* v. *The Steamboat John Jay, supra,* which denied, under the former law, jurisdiction in admiralty to enforce payment of a mortgage upon a vessel. The Court there said that neither in England [9] nor in the United States had the admiralty courts exercised jurisdiction in questions of property between a mortgagee and the owner; that the foundation of the rule was " that the mere mortgage of a ship, other than that of an hypothecated bottomry," was a contract " without any of the characteristics or attendants of a maritime loan " and was made " without reference to navigation or perils of the sea "; that it was a security " to make the performance of the mortgagor's undertaking more certain "; that, while the mortgagor continued in possession of the ship, the mortgagee was disconnected " from all agency and interest in the employment and navigation of her, and from all responsibility for contracts made on her account "; that there was nothing maritime in the contract; and that from the organization of courts of admiralty and their modes of proceeding they cannot secure to the parties to the mortgage " the remedies and protection which they have in a court of chancery."

But it did not follow, because this view was taken of the existing law, that the Congress was without power to amend the law so as to enable the admiralty courts to take cognizance of mortgages on ships, and to regulate priorities of liens, in order to promote investment in shipping securities and thus to advance the maritime interests of the United States. Indeed, in the *Bogart* case the Court seemed to recognize the existence of that constitutional authority. For the Court, in concluding its opinion, observed that the policy of commerce and its exigencies in England had given to its admiralty courts

[9] See *The Neptune,* 3 Hagg. 129 (132).

a more ample jurisdiction in respect to mortgages of ships than they had under the former rule. And the Court pointed out that this "enlarged cognizance of mortgages" had been given by statute 3 and 4 Victoria, chap. 65, and said that "until this shall be done in the United States by congress, the rule, in this particular, must continue in the admiralty courts of the United States as it has been."

The significance of this suggestion cannot be overlooked. The fact that mortgages on ships had not been considered to be maritime contracts was not conclusive as to the constitutional authority of the Congress to alter or supplement the maritime law in this respect, and thus to extend the admiralty jurisdiction, "as experience or changing conditions might require," while keeping within a proper conception of maritime concerns. The ship, documented under the laws of the United States, is the instrumentality of our maritime enterprise, the prime object of our maritime policy. The ship "from the moment her keel touches the water" becomes "a subject of admiralty jurisdiction"; she acquires personality; she becomes competent to contract, is individually liable for her obligations, and is responsible for her torts. *Tucker* v. *Alexandroff*, 183 U. S. 424, 438. The existence of the ship, the investments which make that existence possible, is the necessary postulate of maritime liens. We cannot fail to regard the encouragement of investments "in shipping and shipping securities"—the objective of the Ship Mortgage Act—as an essential prerogative of the Congress in the exercise of its wide discretion as to the appropriate development of the maritime law of the country. The regulation of the priorities of ship mortgages in relation to other liens, and the conferring of jurisdiction in admiralty in order to enforce this regulation, are appropriate means to that legitimate end.

The enlargement of the cognizance of mortgages of ships, in the admiralty courts in England, nearly one hundred years ago, to which the Court referred in the *Bogart* case, was to remedy an evil which had been found to exist. The purpose was " to enable the Court to exercise its ordinary jurisdiction to the full extent." [10] That Act applied whenever the ship was " under arrest by process issuing from the high court of admiralty " or the proceeds of a ship so arrested had been brought into the registry of the court, and the court was invested with " full jurisdiction to take cognizance of all claims and causes of action of any person in respect to any mortgage of such ship or vessel, and to decide any suit instituted by any such person in respect of any such claims or causes of action respectively." 3 & 4 Vict., c. 65, §§ 3, 4. These provisions were expanded by later legislation. The admiralty court in England has jurisdiction in respect of any mortgage duly registered according to the provisions of the Merchant Marine Act, 1894, " whether or not the ship or proceeds are under the arrest of the Court, and such jurisdiction may be exercised by an action *in rem* or *in personam.*" Roscoe's Admiralty Practice, 5th ed., p. 51.

This response " to the exigencies of commerce " has had its counterpart in the legislation of other European States. It may be said that the " general maritime law " takes cognizance of mortgages of ships, provides for their registration, and establishes rules with respect to priorities.[11]

---

[10] See statement of Dr. Lushington in *The Fortitude*, 2 Wm. Rob. 217, 222.

[11] See, e. g., The Netherlands, Maritime Law, Code of Commerce, 1838; France, Act of July 10, 1885, and Decree of June 18, 1886; Belgium, Laws of August 21, 1879, June 12, 1902, February 10, 1908, and September 4, 1908; Denmark, Maritime Law of April 1, 1892, Act 103 of April 29, 1913, also Act 57 of April 1, 1892; Italy, Maritime Law, Code of Commerce of 1883, and Mercantile Marine Code,

Prior to the Ship Mortgage Act the right of the mortgagee to intervene as a claimant of proceeds of a vessel sold by process in the admiralty was recognized and was frequently exercised. *Schuchardt* v. *Ship Angelique, supra; The Lottawanna, supra; The J. E. Rumbell, supra.* The distinction between such an intervention and an original proceeding by the mortgagee was no doubt controlling as a matter of jurisdiction and procedure under the law as it then existed, but it cannot be considered as establishing a criterion of the constitutional power of the Congress in defining jurisdiction and procedure. The Congress undoubtedly could determine the priorities that should be recognized by the admiralty court and, having that authority, the Congress could fix the conditions upon which mortgages of ships documented under the laws of the United States should have the priority specified. The grant of jurisdiction in admiralty to entertain a suit by the mortgagee, where the mortgage complies with the prescribed conditions, in order to enforce the permitted lien against the vessel, is, after all, but a provision of suitable machinery to give effect to the rights which the Congress has created.

If it be concluded, and we think it must be, that the Congress has this power in the case of the mortgage of a vessel to provide for its acquisition, or for the discharge of preëxisting liens, or for its necessities, that is, to authorize the enforcement by suits in admiralty of mortgages given to secure loans for the direct benefit of the vessel, we perceive no ground to deny to the Congress constitutional power to make similar provision as to mort-

1866, as amended; Norway, Maritime Law of July 20, 1893, as amended by Acts of May 4, 1901, July 13, 1917, and July 9, 1920. See, Constant, " The Law Relating to the Mortgage of Ships," Appendix A; " The Progress of Continental Law in the 19th Century," Georges Ripert, Maritime Law, Continental Legal History Series, p. 399.

gages of ships, which comply with its rules, although the proceeds of the loans thereby secured are used for other purposes. The analogy of the decision by Justice Story in *The Draco* case, *supra,* as to bottomry bonds, and of the decision of this Court in the *Conard* case, *supra,* as to respondentia bonds, is apparent. If the maritime law does not require, as Justice Story held, that a bottomry bond, as such, must be given for the necessities of the ship or for the cargo or for the voyage, but that it is sufficient, when given by the owner, that the money be lent upon the bottom of the ship, at the risk of the lender, for the voyage, and that in such case the owner is free to employ the money as he pleases; if, as this Court decided, in the case of a respondentia loan, it is no objection that it is made after the departure of the ship, or that the money lent was not employed in the outfit of the vessel, or invested in the goods on which the risk was run, or that the money was appropriated for purposes wholly unconnected with the voyage, we cannot see that an analogous provision with respect to ship mortgages is so far inconsistent with the fundamental principles of maritime law as to place such mortgages beyond the authority of the Congress in determining the admiralty jurisdiction. The contention to the contrary loses sight of the dominant purpose of the Act, a purpose which the Congress was competent to achieve. That purpose, we repeat, was to establish the worth of " shipping securities," in the interest of the merchant marine. In order to create public confidence in such securities, in obligations issued on the faith of ship mortgages, the Congress deemed it necessary, not to hamper their issue or enforcement by compelling inquiries as to the application of loans, but to give a definite and assured character to such mortgages provided they met certain simple conditions. The Congress in the exercise of its discretion was entitled to consider the methods by which securities are issued to the public and

dealt in, and the well-known usages of business in this regard amply support its judgment.

The authority of the Congress to enact legislation of this nature was not limited by previous decisions as to the extent of the admiralty jurisdiction. We have had abundant reason to realize that our experience and new conditions give rise to new conceptions of maritime concerns. These may require that former criteria of jurisdiction be abandoned, as, for example, they were abandoned in discarding the doctrine that the admiralty jurisdiction was limited to tidewaters. *The Genesee Chief,* 12 How. 443, overruling *The Thomas Jefferson,* 10 Wheat. 428.

The constitutional validity of the grant of jurisdiction by the Ship Mortgage Act has been sustained in *The Oconee,* 280 Fed. 927, in *The Nanking,* 290 Fed. 769, and in *The Lincoln Land,* 295 Fed. 358.[12] We find no reason for reaching a contrary conclusion in the instant cases.

The decrees of the Circuit Court of Appeals are reversed and the causes are remanded for further proceedings in conformity with this opinion.

*Reversed.*

---

[12] The validity of the Act was not questioned in *Morse Drydock & Repair Co.* v. *The Northern Star,* 271 U. S. 552, 555, 556 and its validity has been assumed in several decisions in the lower federal courts. See *The Egeria* (C. C. A. 9th), 294 Fed. 791; *The Northern No. 41* (S. D. Fla.), 297 Fed. 343; *The Red Lion* (E. D. N. Y.), 22 F. (2d) 329; *National Bank* v. *Enterprise Marine Dock Co.* (C. C. A. 4th), 43 F. (2d) 547; *Consumers Co.* v. *Goodrich Transit Co.* (C. C. A. 7th), 53 F. (2d) 972.