MOON ENGINEERING COMPANY, Inc.,
Libelant,

v.

AMERICAN STEAMSHIP VALIANT
POWER, et al., Respondents.

No. 523.

United States District Court
E. D. Virginia,
Newport News Division.

Feb. 18, 1963.

See, also, 193 F.Supp. 460.

Jetts, Sykes & Coupland, Baird, Cren-
shaw & Ware, David H. Batchelder, Jr.,
Norfolk, Va., Ferguson, Yates & Steph-
ens, Newport News, Va., Kanter & Kan-
ter, Vandeventer, Black, Meredith & Mar-
tin, Fine, Fine, Legum & Schwan, How-

ell, Anninos & Daugherty, Steingold, Steingold & Chovitz, Amato, Babalas, Breit & Cohen, Norfolk, Va., Burt M. Morewitz, Newport News, Va., William A. Redfern, Jr., Norfolk, Va., for libellants and intervening libellants.

Seawell, McCoy, Winston & Dalton, Norfolk, Va., for Coal Export Corp.

WALTER E. HOFFMAN, Chief Judge.

The issue in this case raises an interesting question under the Ship Mortgage Act, especially 46 U.S.C. § 802(b)(d), § 911(5) and § 922(a)(5). A related phase of the case pertaining to an upset bid made in connection with the purchase of the VALIANT POWER has previously been considered by the Court of Appeals for the Fourth Circuit. American Tramp Shipping & Development Corp. v. Coal Export Corp., 4 Cir., 276 F.2d 570. From the foregoing opinion it will be noted that Coal Export Corporation held a mortgage on the vessel, securing a balance of approximately $180,000, the validity of which mortgage had not been determined at that time. Coal Export Corporation became the ultimate purchaser of the vessel upon resale. This opinion pertains to the validity of the mortgage.

Following the payment of certain costs and maritime liens having unquestioned priority over the mortgagee and other claimants, there remains a substantial sum in the registry of the court for distribution to the parties entitled thereto.

An examination of the mortgage, bond and trust indenture reveals these facts: at the time of the execution of the mortgage and other pertinent documents, Overseas Investors, Inc. (hereinafter referred to as "Overseas") did not qualify to hold mortgages on United States flag vessels, even though it was a New York corporation, the stock of which was 75% owned by citizens of the United States and otherwise managed by citizens of this country; the reason for disqualification being that the president of Overseas was an alien [1]; it was for this primary reason that Coal Export Corporation (hereinafter called "Coal"), a New York corporation, was selected as trustee-mortgagee; the officers, directors and stockholders of Coal are citizens of the United States; when the mortgagee-trustee documents were executed on April 17, 1959, its entire stock ownership consisting of 300 shares was vested in Erna D. Leir and her husband, Henry J. Leir; on December 30, 1960, an additional 385 shares were authorized for issuance and were thereafter distributed on March 10, 1961, to Henry J. Leir (173 shares), Erna D. Leir (116 shares), Lina Schloss, the mother of Mrs. Leir (58 shares), Louis J. Lipton, a cousin of Mrs. Leir (38 shares), all of whom are citizens of the United States; prior to 1959 the VALIANT POWER and other related vessels were registered under a foreign flag; the Kulukundis (Couloucoundis) group— at that time prominent shipowners—was interested in purchasing several of these foreign flag vessels, including the VALIANT POWER, and contemplated placing them under the United States flag; the prospective purchasers approached Overseas to borrow money for the purpose of consummating these purchases, and the suggestion that the mortgages on the United States flag vessels be held by Coal as trustee emanated from the attorneys for the borrower; title to the vessel then named SS TURMOIL, renamed SS VALIANT POWER, thereafter purchased was placed in Power Steamship Corporation, a Delaware Corporation, and the bond given as evidence of the indebtedness contained the following recital:

"Power Steamship Corporation * * promises to pay to Overseas Investors, Inc. * * * at the office of Coal Export Corporation, * * * the Trustee, * * * the sum of

---

1. The president of Overseas became a citizen of the United States in March, 1960. His name is Conrad W. Gerstel. The documents were executed in April, 1959, at which time § 802 of Title 46 U.S.C., required the president of any such corporation to be a citizen of the United States. The amendment of September 21, 1959, liberalized the requirements to some extent.

"$250,000.00 with interest * * * on the unpaid balance at * * * 1½% per month."

Actually there were three bonds executed—by Power Steamship Corporation, Force Steamship Corporation, and Lib Steamship Corporation—each in the sum of $250,000 on three separate vessels. We are, however, only concerned with the mortgage on the VALIANT POWER.

In the final arrangements for the loan, Conrad W. Gerstel, then an alien, played an important part. Separate bonds were given for the amounts loaned to purchase each vessel, i. e., VALIANT POWER, VALIANT FORCE, and VALIANT LIB. The recital of the bonds indicates that they are secured by first preferred ship mortgages on the vessels POWER, FORCE and LIB, all flying the flag of the United States. They contain a provision that the lender, Overseas, or any subsequent holder, could declare the indebtedness due upon default and, in addition, Overseas required a personal guarantee of the bonds by the stockholders of Power Steamship Corporation and a deposit of all of the capital stock of the latter corporation with Overseas.

Under Chapter 25 relating to ship mortgages, it is provided (46 U.S.C. § 911 (5)):

"When used in this chapter * * *. "(5) The term 'mortgagee', in the case of a mortgage involving a trust deed and a bond issue thereunder, means the trustee designated in such deed."

**2.** Title 46, § 922(a), U.S.C., was amended on September 26, 1961, but the amendments have no pertinency to the present controversy.

**3.** Title 46, § 802(b), U.S.C., reads as follows:

"(b) The controlling interest in a corporation shall not be deemed to be owned by citizens of the United States (a) if the title to a majority of the stock thereof is not vested in such citizens free from any trust or fiduciary obligation in favor of any person not a citizen of the United States; or (b) if the majority of the voting power in such corporation

The libelant and various intervenors argue that this language is applicable only to a "public" bond issue, and that it was not the intent of Congress to provide that a "private" bond issue protect a mortgagee-trustee whose citizenship was that of the United States if the mortgagee-trustee was controlled by alien interests. Coal directs our attention to the provisions of the same Chapter 25 referring to preferred mortgages, wherein it is said (46 U.S.C. § 922(a)(5)):

"(a) A valid mortgage which at the time it is made, includes the whole of any vessel of the United States * * shall, in addition, have, in respect to such vessel and as of the date of the compliance with all the provisions of this subsection, the preferred status given by the provisions of section 953 of this title, if [2] * * *.

"(5) The mortgagee is a citizen of the United States and for the purposes of this section the Reconstruction Finance Corporation shall, in addition to those designated in sections 888 and 802 of this title, be deemed a citizen of the United States."

We advert to 46 U.S.C. § 802, the particular reference to § 802(b) (d), which is a part and parcel of Chapter 23, the Shipping Act, the pertinent provisions of which are set forth in the footnote.[3] At first blush it would appear that the separation by Congress of the "Shipping Act 1916"—same being Chapter 23 including §§ 801–842 of Title 46 U.S.C.—the "Mer-

is not vested in citizens of the United States; or (c) if through any contract or understanding it is so arranged that the majority of the voting power may be exercised, directly or indirectly, in behalf of any person who is not a citizen of the United States; or, (d) if by any means whatsoever control of the corporation is conferred upon or permitted to be exercised by any person who is not a citizen of the United States."

§ 802(a) was amended in immaterial respects on September 26, 1961. The provisions of § 802(c) clarify § 802(a) as to the meaning of 75% interest in a corporation.

chant Marine Act, 1920"—same being Chapter 24 including §§ 861–889 of Title 46 U.S.C.—and the "Ship Mortgage Act, 1920"—same being Chapter 25 including §§ 911–984 of Title 46 U.S.C.—would afford complete protection to Coal because of the use of the words "within the meaning of this chapter" as set forth at the commencement of § 802 and "when used in this chapter" contained at the beginning of § 911. However, under 46 U.S.C. § 888, reference is made to the definition of the words "citizen of the United States" as having the meaning assigned to them by §§ 801, 802 and 803. Under the footnotes to § 861, the phrase "this Act" refers to the Act of June 5, 1920, which includes what is now contained in numerous sections including §§ 911 and 922. While not entirely free from doubt, the balance of this discussion will be under the assumption that § 802 is applicable to a mortgagee-trustee such as Coal.

 Dealing with the contention of the libelant-intervenors that § 911(5) is limited to a "public" bond issue, the argument is without merit. It is the duty of the court "to apply statutes on the basis of what Congress has written, not what Congress might have written." United States v. Great Northern Ry. Co., 343 U.S. 562, 575, 72 S.Ct. 985, 992, 96 L.Ed. 1142. In the language of § 911(5), Congress did not suggest that the bond would be invalid if it fell into the hands of persons who do not qualify as citizens under § 802. Nor did Congress state that the bond issue had to be a "public" one. We do not find from the legislative history any pertinent comment which leads to the belief that investments by aliens could not be made in ship mortgages. In Detroit Trust Co. v. The Thomas Barlum, 293 U.S. 21, 55 S.Ct. 31, 79 L.Ed. 176, after a minute examination of the provisions of the act, the court said (293 U.S. 37, 55 S.Ct. 35):

"An examination of the provisions of the Act leaves no room for doubt that the subject of mortgages of vessels, and, in particular, the priority which should be assigned to them in relation to other liens, was under the close scrutiny of the Congress in determining its policy. But, among all the minute requirements of the Act, we find none as to the application of the proceeds of loans which such mortgages secure. No condition is imposed as to the purposes for which the moneys are lent. * * * We are not at liberty to imply a condition which is opposed to the explicit terms of the statute. * * * The question of policy—whether different terms should have been imposed—is not for us. We may not add to the conditions set up by Congress any more than we can subtract from them. They stand, as defined, precise and complete."

 The libelant-intervenors urge that the trust arrangement was a "mere sham or subterfuge" claiming a device on the part of Overseas and Coal to evade the law and that Coal was under the "control" of Overseas or its president, Gerstel, the alien. We do not agree that the facts justify such a conclusion. Coal was a bona fide domestic corporation, engaged primarily in the sale and exportation of coal, when it was selected as trustee. Its officers, directors and stockholders were citizens of the United States. It was not a mere "dummy" corporation established for the specific purpose of serving as trustee. Concededly Coal was selected as trustee because, at that particular time, Overseas could not qualify under § 802 as Gerstel was its president.

Overseas, the original purchaser and now holder of the bond in the face amount of $250,000, has issued both preferred and common stock. Henry J. and Erna D. Leir own 75% of the common stock with the remaining 25% being owned by Conrad W. Gerstel. The preferred stock is owned by Gerstel to the extent of 25% and the balance is owned by Sadi S. A., a Swiss corporation. Continental Ore Company, a New York partnership, owns 90% of the stock of Sadi S. A., the partners being Henry J. Leir, Erna D. Leir, Lina Schloss and Louis J. Lipton, all of whom are citizens of the

United States. At the time of the execution of the mortgage documents Henry J. Leir was chairman of the board of directors of Overseas; Gerstel and Lipton were also directors and served as president and vice-president, respectively.

That Leir may have relied to some extent upon Gerstel's advice in financial matters is of no great consequence. Gerstel drew a salary from Overseas, plus some fees from other companies in which Leir was financially interested. However, Coal paid no fees or salary to Gerstel. In addition to Coal and Overseas, Leir had substantial interests in Continental Ore Company, International Ore & Fertilizer Corporation, Continental Aluminum Corporation and Barites Corporation, the latter having merged with Coal in 1961. Leir served as chairman of the board or president in each of the corporations. Each business maintained its office at 500 Fifth Avenue, New York.

■■ While the locale of the various business enterprises points to close cooperation, it is not sufficient to say that this destroys the validity of the mortgage. Congress has not said that the holder of the mortgage indebtedness must be entirely divorced from any business relations with the mortgagee-trustee. To so hold would disqualify many banking institutions doing business with the lender from serving in that capacity. Nor has Congress said that reliance upon financial advice from an alien invalidates the mortgage.

The situation thus presented is a far cry from that confronting the court in Meacham Corp. v. United States, 4 Cir., 207 F.2d 535, cert. granted, 347 U.S. 932, 74 S.Ct. 631, 98 L.Ed. 1083, dismissed per stipulation, 348 U.S. 801, 75 S.Ct. 17, 99 L.Ed. 633, upon which the libelant-intervenors so strenuously rely [4]. The Meacham case did not involve the validity of any ship mortgage. It specifically rejected the contention of the owner that a Delaware corporation, controlled by Chinese interests, complied with §§ 802 and 808 relating to the transfer of a United States flag vessel without the approval of the Maritime Commission. In the present controversy there is no suggestion that the Kulukundis (Couloucoundis) group violated any statute of the United States in causing title to the vessel to be placed in Power Steamship Corporation under the flag of the United States. In Meacham all of the beneficially interested persons were aliens seeking to acquire United States flag ships for alien purposes, whereas here there was no such alien purpose.

■ Congress has seen fit to make the citizenship of the trustee the primary consideration in determining whether the mortgage is held by a citizen of this country, 46 U.S.C. § 911(5), and in ascertaining the validity of any preferred mortgage, 46 U.S.C. § 922(a) (5). We cannot rewrite the statutes. The operating and financial control of Coal rested in citizens of the United States. Assuming arguendo the operating control of Overseas to have been in Gerstel, the ultimate control of Overseas remained with United States citizens through its stock ownership. The stock of neither corporation was held under any trust or fiduciary obligation in favor of aliens. The fact that Congress has only provided for citizenship status of the mortgagee-trustee is a clear indication that foreign capital was not to be excluded in financing United States flag vessels. There exists no contract or understanding among the stockholders of either Coal or Overseas whereby anyone but the true owner of the stock exercises the control and voting power [5]. It appears abundantly clear from this record that Henry J. Leir was the ultimate controlling factor in Coal and Overseas although, as pre-

---

4. The opinion is by Judge Soper, with Judge Dobie concurring. Chief Judge Parker dissented.

5. We attach no significance to the fact that Erna D. Leir relied upon her husband, Henry J. Leir, in determining her decisions. In any event, Henry J. Leir was a citizen of the United States.

viously noted, he relied heavily upon Gerstel's advice in financial affairs.

In summary, it is the view of this court that the preferred ship mortgage on the VALIANT POWER is valid and that the requirements of the statutes of the United States have been met. Proctors for Coal will prepare and present, after first affording an opportunity for inspection and endorsement, an appropriate decree in accordance with this memorandum, which is adopted by the court in lieu of specific findings of fact and conclusions of law pursuant to Admiralty Rule 46½.