**McLOUTH STEEL CORPORATION**
**v.**
**The UNITED STATES.**
**No. 58-60.**

United States Court of Claims.
June 7, 1963.

---

**168**

Ernest Getz, Detroit, Mich., for plaintiff.

Conrad T. Hubner, Jr., San Francisco, Cal., with whom was Asst. Atty. Gen. Louis F. Oberdorfer, for defendant. Edward S. Smith, Lyle M. Turner, Philip R. Miller, John F. Palmer and Earl L. Huntington, Washington, D. C., were on the briefs.

Before JONES, Chief Judge, REED, Justice (Ret.), sitting by designation, and LARAMORE, DURFEE and DAVIS, Judges.

REED, Justice (Ret.), sitting by designation.

■ Sections 1800, 1801 of the Internal Revenue Code of 1939 impose an ad valorem documentary stamp tax on "all bonds, debentures, or certificates of indebtedness issued by any corporation * * *."[1] We are called upon to determine whether two instruments issued by the taxpayer in 1953 are bonds within the meaning of this statute.

The taxpayer, McLouth Steel Corporation, considered the instruments taxable in 1953, for it purchased and affixed the stamps at the time of their issuance. However, after the decision of the Supreme Court in United States v. Leslie Salt Co., 350 U.S. 383, 76 S.Ct. 416, 100 L.Ed. 441 (1956), the taxpayer filed a claim for a refund, asserting that the instruments were not covered by the statute. The taxing authorities having rejected taxpayer's claim, the present action for a refund was filed in this court. The case is now before us on the Government's motion for a summary judgment.

The instruments in question are each labelled a "First Mortgage 4¼% Sinking Fund Bond," and are identical in terms except as to amount and payee. One, with a face value of $30,000,000, and numbered No. R 000001, was issued to the Metropolitan Life Insurance Company; the second, with a face value of $26,000,000, numbered No. R 000002, was issued to The Prudential Insurance Company of America. They are issued in the name of the respective insurance companies and registered with the borrower, McLouth. The instruments are formal documents, printed on a steel engraved

---

1. "§ 1800. Imposition of tax
"There shall be levied, collected, and paid, for and in respect of the several bonds, debentures, or certificates of stock and of indebtedness, and other documents, instruments, matters, and things mentioned and described in sections 1801 to 1807, inclusive, or for or in respect of the vellum, parchment, or paper upon which such instruments, matters, or things, or any of them, are written or printed, the several taxes specified in such sections.

"§ 1801. Corporate securities
"On all bonds, debentures, or certificates of indebtedness issued by any corporation, and all instruments, however termed, issued by any corporation with interest coupons or in registered form, known generally as corporate securities, on each $100 of face value or fraction thereof, 11 cents: * * *." 26 U.S.C. §§ 1800, 1801 (1952 ed.) ; compare Internal Revenue Code of 1954 §§ 4311, 4381, 26 U.S.C. §§ 4311, 4381 (1958 ed.).

border, and issued under the seal of the taxpayer.

Each instrument has a maturity of 19½ years, and carries interest of 4¼% on the unpaid balance, payable semiannually. The instruments are each subject to the terms of both a "Purchase and Loan Agreement" executed between McLouth and the insurance companies, and an "Indenture of Mortgage and Deed of Trust" executed between McLouth and the National Bank of Detroit, as trustee. McLouth has the right to redeem the Bonds at any time upon the payment of a stipulated premium. The insurance companies have the right to demand that McLouth exchange their originally issued Sinking Fund Bonds in exchange for registered or coupon bonds in the same aggregate principal amount but in smaller denominations. The sinking fund provisions are set out in the indenture. Substantial restrictions upon McLouth's right to incur additional indebtedness and to pay dividends are also imposed by the indenture agreement.

Contemporaneously with the issuance of the above Sinking Fund Bonds, McLouth also borrowed an additional $4,000,000 from each of the two insurance companies, evidenced by "5¼% Income Convertible Notes," and $14,000,000 from certain banks, with the National Bank of Detroit as agent, under a "Bank Loan Agreement." The Sinking Fund Bonds and the bank loans are secured by property of the taxpayer under the indenture agreement, but the Income Convertible Notes are not covered by the indenture.

In the Leslie Salt case, the taxpayer had also borrowed large amounts from two insurance companies, giving to each a single instrument labelled "3¼% Sinking Fund Promissory Note." The Supreme Court there rejected the Government's position that because the Notes were "of large amounts, long maturity, and secured by an elaborate underlying

agreement," they were taxable as either "debentures" or "certificates of indebtedness" under the stamp tax statute. In holding the Promissory Notes not subject to the tax, the Court suggested that the only such instruments to which the tax applies are those:

"issued (1) in series, (2) under a trust indenture, and (3) in registered form or with coupons attached. In other words, that tax was considered to apply only to marketable corporate securities, as that term is generally understood." 350 U.S. at 389–390, 76 S.Ct. at 420.

The Promissory Notes in Leslie Salt satisfied none of the three enumerated conditions. The Sinking Fund Bonds involved in the present case meet all three. The Promissory Notes were issued pursuant only to agreements between the issuer and the lender. The Bonds here were issued pursuant to a similar agreement, but also under an indenture with an independent trustee. The Promissory Notes were neither in registered form nor with coupons attached; the Bonds here are in registered form.

The Promissory Notes contained no serial number; the Bonds in this case do. Taxpayer correctly argues that the use of a serial number is not what is meant in financial parlance by an issue "in series." An issue of serial bonds is one in which certain (series) of the bonds automatically mature at given intervals; serial bonds are used as an alternative to sinking fund bonds as a method of insuring preparation for redemption prior to the maturity date of the issue.[2] Nonetheless, we cannot agree that the reference to "in series" in Leslie Salt was intended to adopt this technical distinction for purposes of the stamp tax. The administrative history of the statute, with reference to which the statement in Leslie Salt was made, indicates that it has been only the presence or absence of a serial number to which significance has

2. Guthmann & Dougall, Corporate Financial Policy 222–23 (4th ed. 1962); Dewing, Financial Policy of Corporations 249 (5th ed. 1953).

'heretofore been attached.[3] We see no reason why sinking funds bonds should be immune from the documentary stamp tax, and none has been suggested to us. Hence, we attach some slight significance to the fact that the Bonds here were issued with serial numbers, but we deem it of no consequence that the Bonds were not issued serially.

Taxpayer's Sinking Fund Bonds thus contain all the normal features of a corporate bond,[4] and are distinguishable from the instruments in Leslie Salt in the three respects considered significant by the Supreme Court. Nonetheless, the taxpayer argues that the instruments are not taxable under the statute because they are not marketable. It is true that in Leslie Salt marketability was stated to be of prime importance—indeed, "[t]he essence of an 'investment security.'" 350 U.S. at 393, 76 S.Ct. at 422.

And see Niles-Bement-Pond Co. v. Fitzpatrick, 213 F.2d 305, 311 (C.A. 2, 1954). But what meaning are we to give to "marketability" in this context? The Government argues that the Supreme Court's reference to marketability meant "only that an instrument which is to be made subject to the stamp tax should have on its face those formal incidents which are conducive to marketability or which are generally found on marketed instruments."[5] The taxpayer, on the other hand, asserts that the term should be given its "specific technical meaning," under which, according to the affidavit of its financial expert, the term applies to an issue "for which purchasers can be found at a price reasonably commensurate with the prices * * * at which evidences of indebtedness with similar maturity dates of other corporations are concurrently being marketed."[6]

---

3. In reference to the Revenue Act of 1917, c. 63, 40 Stat. 300, the Treasury ruled as follows:

"(3) Instruments containing the essential features of a promissory note, but issued by corporations *in numbers* under a trust indenture either in registered form or with coupons attached, embodying provisions for acceleration of maturity in the event of any default by the obligor, for optional registration in the case of bearer bonds, for authentication by the trustee, and sometimes for redemption before maturity, or similar provisions, are bonds within the meaning of the statute, whether called bonds, debentures, or notes. * * *" T.D. 2713, 20 Treasury Decisions 358, 359 (1918). (Emphasis added.)

In the regulations to the Revenue Act of 1918, c. 18, 40 Stat. 1057, "in series" was substituted for "in numbers," though the latter phrase was retained in the caption to the regulation:

"Art. 8. Instruments issued by corporations *in numbers,* under a trust indenture, are bonds.—Instruments containing the essential features of a promissory note, but issued by corporations *in series,* secured by a trust indenture, either in registered form or with coupons attached, embodying provisions for acceleration of maturity in the event of any default by the obligor, for optional registration in the case of bearer bonds, for authentication by the trustee, and in some instances for redemption before maturity, or similar provisions, are bonds within the meaning of the statute, whether called bonds, debentures, or notes." Treas.Reg. 55, Art. 8 (1919). (Emphasis added.)

The phrase was deleted altogether from later regulations, see Treas.Reg. 71, § 113.55 (1941) but "in series" has been restored in the regulations to the 1954 Code. Treas.Reg. § 43.4381–1(a).

Compare United States v. Royal Loan Co., 61 F.Supp. 436 (E.D.Mo.1945), aff'd 154 F.2d 556 (C.A. 8, 1946).

4. As noted above, the Bonds also contain the usual title, formal appearance, and provisions of a corporate bond.

5. The Government points out, inter alia, that the opinion in Leslie Salt dealt only with the three features discussed above, and gave no consideration to the factors taxpayer argues are subsumed under the head of marketability. Furthermore, it is argued that the statement in the opinion that *"in other words"* the tax applies only to marketable securities, made after listing these three features, suggests that an instrument containing these characteristics is necessarily marketable for purposes of the stamp tax.

6. The affidavit reads in part as follows:

"4. [The affiant] represents that the term 'marketable' as applied to issues of evidences of indebtedness of industrial corporations, where the maturity of the indebtedness is to occur at a remote future date, has a specific technical meaning generally understood and accepted within the

We cannot agree with taxpayer that an instrument otherwise a bond is not subject to the stamp tax because it can be sold, or resold, only at a substantial discount. It was stated in the early case of United States v. Isham, 17 Wall. 496, 504, 21 L.Ed. 728 (1873), and reaffirmed in Leslie Salt, 350 U.S. at 396, 76 S.Ct. at 423, that "[t]he liability of an instrument to a stamp duty, as well as the amount of such duty, is determined by the form and face of the instrument, and cannot be affected by proof of facts outside of the instrument itself." See also Lederer v. Fidelity Trust Co., 267 U.S. 17, 45 S.Ct. 206, 69 L.Ed. 494 (1925). The taxpayer's affidavit recognizes that to evaluate marketability as therein defined, it would be necessary to consider such facts as those bearing on the financial reputation of the borrower; yet we can conceive of no example more at odds with the rule of Isham. Taxpayer predicates lack of marketability in this case primarily on the size of the two Bonds involved.[7] Admittedly the amount of in-

financial community and by persons involved in the securities business, to wit: a 'marketable' issue is one for which purchasers can be found at a price reasonably commensurate with the prices (expressed in yield to maturity) at which evidences of indebtedness with similar maturity dates of other corporations are concurrently being marketed, taking into account the many factors entering into the determination of the market values of the specific obligations of the respective corporations, including but not restricted to the following:

"a. Reputation of the borrower in the financial community at the time the borrowing takes place, including an assessment of the ability of the borrower to compete, and to continue to compete for an extended future period, on profitable terms, in the business or businesses in which it is engaged;

"b. Dollar size of the obligations being placed on the market in relation to the amount of funds available in the market for investment in obligations of the type being marketed;

"c. The type of obligation and the relative amounts of senior, parity and junior instruments to be outstanding on completion of the financing, especially the amount of equity securities then to be outstanding;

"d. Adequacy of the restrictive provisions in the indenture underlying the issue, including but not restricted to:

"(1) The reasonableness of the provisions permitting the corporation to issue and sell additional pari passu evidences of indebtedness within limits in the future, in order to facilitate the financing of requirements for new funds arising from technological developments within the industry or from growth in demand for products or services resulting from increased population or other development, such provisions usually taking the form of the discretionary issuance of additional obligations, in series, with differing maturities, interest rates, sinking fund provisions and redemption features for each series, under indentures supplemental to and permitted by the underlying indenture and providing with respect to secured obligations that the amount of additional indebtedness permitted under the underlying indenture shall not exceed a given percentage, say 66⅔% of net additions to property, and with respect to unsecured obligations that the amount of additional indebtedness shall meet certain asset and/or earnings tests, such issues generally being referred to as 'open-end' issues; and

"(2) The reasonableness of the provisions, if any, limiting the payment of dividends on stock and the purchase and retirement of instruments ranking junior to the obligations issued under the indenture, the objective generally, being to prevent the directors of the corporation from diluting the proportion of equity underlying the obligations but to permit the payment of dividends in reasonable amounts so as not to impair the value in the market of the stocks of the corporation in relation to the values of the stocks of competing corporations, other factors being equal."

7. The affiant also suggests a second reason which we think insupportable in any event. The affiant emphasizes that under the terms of the indenture McLouth's ability to borrow is so restricted that it will be unable to satisfy its probable future capital requirements without obtaining the consent of all parties protected by the indenture (or by redeeming the Bonds). The necessity for unanimity furnishes "the initial holders of the two instruments with strong incentive not to broaden the number of holders through sale of a portion of their holdings," and, similarly, "the considerations deterring an initial holder from attempting the re-

debtedness represented by each Bond can be determined from the "face" of the instrument. But size alone has no bearing on the taxability of an instrument. Niles-Bement-Pond Co. v. Fitzpatrick, supra, 213 F.2d at 310; Belden Mfg. Co. v. Jarecki, 192 F.2d 211, 214 (C.A.7, 1951). And were we to consider the extent to which the amount of the Bonds affects the ability of the holder to sell them at a price approximating their face value, we would be required to hear and evaluate evidence going far beyond the terms of the instrument.

Moreover, although there are of course more possible buyers for one thousand dollar than for thirty million dollar bonds, that is not to say that the relatively small group of insurance companies and banks and others in a position to purchase the latter do not constitute a market for such instruments. How large an interested group of purchasers does taxpayer suggest would be necessary before an instrument could be deemed marketable? Or how much of a discount would the seller have to bear to render it unmarketable? We do not believe that the applicability of the stamp tax can be permitted to turn on the answer to such questions as these. Compare Standard.Packaging Corp. v. United States, 197 F.Supp. 788 (D.Minn.1961); Georg Jensen, Inc. v. United States, 173 F.Supp. 762 (S.D.N.Y.1959), rev'd on other grounds, 275 F.2d 386, on rehearing 279 F.2d 870 (C.A.2, 1960).

■ Rather, in holding the taxpayer's Sinking Fund Bonds to be taxable as bonds within the meaning of the statute, we lay particular stress on the existence of the indenture and the independent trustee, the National Bank of Detroit. The presence of an indenture and trustee is commonly regarded as differentiating a bond from a promissory note. The latter is a two-party agreement, whereas the presence of a trustee brings a third party into the transaction. Promissory notes are ordinarily used "when there is a private deal and only one or a very few investors." Childs, Long-Term Financing 119. On the other hand, an indenture and a trustee are normally used in connection with an issue which is designed to be widely traded, in order to safeguard the rights of the many holders who are often unable effectively to protect themselves and to eliminate the necessity for a separate contract each time the bond is traded. Id., at 91–93; Guthmann & Dougall, supra, at 170–71, 176–77; Baker & Cary, Cases on Corporations 1016 (3d ed. 1959); compare Berle & Warren, Cases on Business Organization 862. Because an instrument issued under an indenture is normally designed for marketing to the public, when an indenture and trustee accompany the other features found in the instruments here under scrutiny, the instrument will normally be a corporate security, as that term is generally understood. This may not invariably be true, but taxpayer has pointed to nothing sufficient to render this generalization inapplicable to the instruments involved in the present case.

For the reasons stated, we hold that the two Sinking Fund Bonds are subject to the stamp tax, and that the Government's motion for summary judgment must be granted. Plaintiff's petition is therefore dismissed.

---

sale of a portion of its holdings would also deter a prospective purchaser from purchasing the obligations at a price commensurate with its value to the initial holder." But at most this tends to show only that if the present instruments were split into smaller denominations, the resulting instruments might not be marketable. It does not contradict the fact that

when the number of holders is small, the restrictive provisions tend to protect the bondholders and thus increase the worth of the Bonds. Though discouraging a sale of *a portion* of the issue, the restrictive provisions increase the marketability of the single Bonds to any purchaser large enough to consider such an investment.