**CHEMICAL BANK NEW YORK TRUST COMPANY, Trustee, Mortgagee,**

v.

**STEAMSHIP WESTHAMPTON (formerly Steamship Montauk Point), her engines, boilers, etc.**

No. 4451.

United States District Court
D. Maryland.

June 11, 1964.

Ober, Williams, Grimes & Stinson, Baltimore, Md., Thacher, Proffitt, Prizer, Crawley & Wood, New York City (William A. Grimes, Baltimore, Md., and Edward C. Kalaidjian, New York City, advocates), proctors for libelant Chemical Bank New York Trust Co., Trustee.

Sol C. Berenholtz, Baltimore, Md. (Solomon Kaplan, advocate), Baltimore, Md., proctor for Trustees of Seafarers Vacation Plan, objecting intervening libelant.

Semmes, Bowen & Semmes, Baltimore, Md. (David R. Owen and William R. Dorsey, III, advocates), Baltimore, Md., proctor for Caltex (Overseas) Limited, Texaco, Inc. (Boal, McQuade & Fitzpatrick, New York City, of counsel), and Fertex Steamship Corporation (Foley & Grainger, New York City, of counsel), objecting intervening libelants.

Thomas B. Eastman, Baltimore, Md., proctor for International Maritime Supplies Co., Ltd., objecting intervening libelant.

John H. Skeen, Jr., Baltimore, Md., proctor for The Marine Midland Trust Co. of New York, intervening libelant.

Thomas J. Kenney, U. S. Atty., Baltimore, Md. (Leavenworth Colby, Anthony W. Gross, attorneys, Dept. of Justice, and John R. Tankard, Asst. Gen. Counsel, Maritime Administration, of Washington, D. C., of counsel), amicus curiae by invitation of the court.

THOMSEN, Chief Judge.

This libel in rem against the Steamship Westhampton, her engines, boilers, etc., was filed on January 14, 1963, by Chemical Bank New York Trust Company, Trustee (Chemical), to foreclose what purports to be a first preferred mortgage on the vessel. The validity of the mortgage was questioned initially by the owner, Seatrade Corporation (Seatrade), but its objections were withdrawn before the entry of the order of sale. The vessel was sold on March 28, 1963, for $2,602,000, the sale was confirmed, and the Marshal has paid the net proceeds of sale, amounting to $2,551,104.14 into the Registry of the Court.

Pursuant to orders permitting interested parties other than the owner to contest the validity of the mortgage, several intervening libelants who assert liens on the vessel have challenged its validity.[1]

The issue is whether the so-called "First Preferred Mortgage and Indenture" (the mortgage) dated August 6, 1962, from Seatrade to Chemical, as Trustee, meets all the tests of a "preferred mortgage" set out in the Ship Mortgage Act, 46 U.S.C.A. § 911 et seq., particularly the requirement of sec. 922 (a) (5) that the mortgagee be a citizen

1. The Objectors include the Trustees of Seafarers Vacation Plan, Caltex (Overseas) Ltd., Texaco, Inc., Fertex Steamship Corporation and International Maritime Suppliers Company, Ltd. The alleged liens of some of these Objectors have been challenged by Chemical, but that challenge is not presently before the Court. William Krause, Jr., a personal injury claimant, contends that his claim is superior to the mortgage, admittedly a sound contention if his claim is valid. 46 U.S.C.A. § 953.

of the United States. Chemical is a citizen of the United States. Hamburgische Landesbank Girozentrale (Landesbank), a corporation of Hamburg, Germany, the holder of the only bond issued under the deed of trust, is not a citizen of the United States.

### Contentions of the Parties

Chemical relies on sec. 911(5), which provides: "The term 'mortgagee', in the case of a mortgage involving a trust deed and a bond issue thereunder, means the trustee designated in such deed." Chemical's principal argument is that the mortgage involves a trust deed and a bond issue thereunder, that Chemical is the trustee designated in the deed and is therefore the mortgagee, and that the citizenship of Landesbank is immaterial.

Objectors contend that the term "bond issue", as used in sec. 911(5), means a public issue of bonds, and not a private issue or placement, where there is only one lender and bondholder; they argue that this construction of the Act is supported by the legislative history of the relevant statutes and by the early administrative rulings; and that it would thwart the purpose of the Act to permit a single alien lender, who could not qualify as a mortgagee, to use the device of a trust indenture and a single bond to circumvent sec. 922(a) (5), especially where the indenture gives the lender so great a measure of potential control as is given by the indenture in this case.[2]

### Facts

Most of the facts have been stipulated, many exhibits have been filed, testimony has been taken, and the questions involved have been fully briefed and argued.

The SS Westhampton, a T–2 tanker, was converted to an ore carrier at the Stuelcken Shipyard in Hamburg, Germany, under a contract dated August 21, 1961, between the predecessor in interest of Stuelcken and Manuel E. Kulukundis, to whom Seatrade is successor in interest. The work was completed about August 1, 1962, but some months before that date Seatrade, which had become the owner of the vessel, indicated a de-

2. Objectors argue that the ordinary meaning of the term "bond issue" is so clear that there is no need for consulting the legislative history; but that if the meaning is not so clear, the legislative history shows that Congress wanted control of the vessels covered by the Act to remain in United States citizens, and made various provisions to that end; that sec. 922 (a) (5), requiring that mortgagees be citizens of the United States, was included in the Act because of a mortgagee's potential control, and because mortgages had theretofore been used as a device to obtain control of American vessels; that sec. 911(5) was included in the Act to provide for public bond issues, where there are numerous bondholders, and to prevent possible forfeiture of the vessel under other provisions of the statutes if some of the bonds fall into the hands of aliens by inheritance or purchase; and that the rulings of the General Counsel of the Shipping Board, the predecessor of the Maritime Administration, made during the 1920's, shortly after the adoption of the Act, support the position taken by Objectors.

Chemical replies that the ordinary meaning of "bond issue" includes private issues as well as public issues; that the purpose of Congress in providing that mortgagees must be citizens does not require that bondholders also be citizens; that this conclusion is supported by recent rulings of the Maritime Administration and the Bureau of Customs; that a requirement that the bondholder be a citizen would undercut the purposes of the Ship Mortgage Act and the other statutes designed to foster the merchant marine; and that the mortgage and indenture in this case reflected a normal commercial transaction, not an attempt to evade the spirit of the law, and did not give Landesbank control of the ownership or operation of the vessel.

At the invitation of the Court, the government has appeared as amicus curiae and has filed a memorandum. The first five sections, submitted by the Department of Justice and the Maritime Administration (Maritime) contain a helpful review of the relevant statutes and legislative history. The sixth section presents the arguments of Maritime, which support generally the position taken by Chemical. The Department of Justice takes no position on the merits of the case.

sire to pay Stuelcken only 30% of the contract price in cash, the balance to be secured by a mortgage on the vessel. Stuelcken was a customer of Landesbank, a West German corporation with no place of business in the United States, and Landesbank agreed to finance the credit.

In May or June, 1962, Landesbank, which was a correspondent of Chemical, requested Chemical to act as "mortgagee-trustee" under a proposed preferred ship mortgage on the vessel. The reason for this request was that Landesbank was not a United States citizen and therefore could not qualify as a mortgagee under the Ship Mortgage Act, whereas Chemical could. 46 U.S.C.A. § 922(a) (5). Chemical agreed, and the original draft of the mortgage was prepared by New York attorneys for Landesbank. The Court finds as a fact that no economic or business reason affected the decision to use the form of transaction which was adopted in this case. The closing was held in New York on August 6, after Albrecht Roscher, a German attorney in the employ of Landesbank, had come to New York with a power of attorney from Landesbank to sign documents on its behalf.

Upon execution of the mortgage on August 6, Landesbank set up a deposit in favor of Stuelcken in the amount of 70% of the shipyard's bill. Seatrade acknowledged receipt of the consideration for the mortgage by letter to both Landesbank and Stuelcken. It is stipulated that so far as Chemical knows, Landesbank dispensed the proceeds of the loan to Stuelcken in part payment of the latter's charges to Seatrade for the conversion of the Westhampton. Stuelcken confirmed to Seatrade that the deposit had been set up in Landesbank at Seatrade's request. The proceeds of the loan did not pass through Chemical's hands and never left Germany.

A single bond in the full amount of the indenture, DM 3,836,000 (equivalent to approximately $960,000, but payable in German funds) was executed by Seatrade, authenticated by Chemical, redelivered to Seatrade and then delivered to Landesbank by Seatrade. At the same time, Kulukundis, president of Seatrade, gave Landesbank his personal written guarantee of payment of the bond. Seatrade also gave Landesbank ten promissory notes, each in the amount of an instalment of principal and interest, guaranteed by Kulukundis. There was a written agreement protecting Seatrade and Kulukundis against having to pay both the bond and the notes.

Landesbank has at all times been the owner of the bond. At the closing on August 6, Landesbank gave Chemical a written warranty that it was purchasing the bond for its own account as an investment, with the intention of holding the same until maturity, and agreed that it would not dispose of the bond or any portion thereof without Chemical's consent. Such consent has never been requested or given. The bond was registered in the name of Landesbank as to both principal and interest. The indenture permitted multiple bonds not exceeding DM 3,836,000, but that is the usual practice even when it is intended that only a single bond will be issued initially. Landesbank never contemplated that its bond would be split into lesser denominations.

The bond was not registered under the Securities Act of 1933, because it was clearly exempt from registration as not "involving any public offering" within the meaning of sec. 4(1) of that Act.

The Westhampton is a vessel of the United States, as that term is used in the Ship Mortgage Act, 46 U.S.C.A. § 911 et seq. The mortgage was duly endorsed upon the vessel's document on August 6, 1962, as required by sec. 922 (a) (1), and was recorded on the same day in the manner provided in sec. 921, as required by sec. 922(a) (2).

The mortgage indenture contains a number of clauses, customarily included in such documents, which give a considerable measure of control to Landesbank as the sole bondholder. Sec. 4.1 provides that in case any one or more of the specified "events of default" shall

occur and be continuing, "then and in each and every such case the trustee may, and upon written request of the majority in principal amount of the bonds shall", inter alia: 4.1(4), take and enter into possession of the vessel at anytime wherever the same may be, without legal process, and lease, charter, operate or otherwise use the vessel, accounting only for the net profits, if any, arising from such use; and 4.1(5), if it seems desirable, sell the vessel at any place and in such manner as the trustee may deem advisable, after specified notice, without a court proceeding. Most importantly, sec. 4.2 provides: " * * * At any such sale, any holder of any Bonds may bid for and purchase such property and upon compliance with the terms of sale may hold, retain and dispose of such property without further accountability therefor." Sec. 4.9 provides that after an event of default, the ship owner can cure the events of default only if the bondholders consent. Under sec. 5.5 the trustee may be removed at any time by the bondholder, but under sec. 5.4 any successor trustee must be a citizen of the United States within the meaning of the Act.

On January 2, 1963, Chemical cabled Landesbank that Seatrade had defaulted in sinking fund and interest payments due December 31, 1962. On January 11 Landesbank instructed Chemical to declare the loan due. Chemical did so by letter to Seatrade dated January 14. Pursuant to cabled instructions from Landesbank, Chemical filed the libel in this case on January 14. Landesbank thereafter advanced to Chemical funds to cover expenses incurred in preserving the vessel while it was in the Marshal's custody. The vessel was sold under court order on March 28, 1963, and the proceeds have been paid into the Registry of this Court.

### Applicable Statutes

The Ship Mortgage Act was enacted as part of the Merchant Marine Act of 1920, which dealt with a great variety of maritime problems. The purpose and policy of the Act were stated in its first section, which, slightly modified, is now 46 U.S.C.A. § 861.[3]

That purpose is similar to the purpose of the Shipping Act, 1916,[4] which contained a number of provisions, still in effect, confining ownership and control of American-flag vessels to citizens of the United States. Sec. 2 (46 U.S.C.A. §§ 802 and 803) prescribes the requirements for corporations, partnerships or associations to qualify as citizens of the United States.[5] Sec. 9 (46 U.S.C.A. §

3. 46 U.S.C.A. § 861 reads as follows: "It is necessary for the national defense and for the proper growth of its foreign and domestic commerce that the United States shall have a merchant marine of the best equipped and most suitable types of vessels sufficient to carry the greater portion of its commerce and serve as a naval or military auxiliary in time of war or national emergency, ultimately to be owned and operated privately by citizens of the United States; and it is declared to be the policy of the United States to do whatever may be necessary to develop and encourage the maintenance of such a merchant marine, and, insofar as may not be inconsistent with the express provisions of this act, the Federal Maritime Board and the Secretary of Commerce shall, in the disposition of vessels and shipping property as hereinafter provided, in the making of rules and regulations, and in the administration of the shipping laws keep always in view this purpose and object as the primary end to be attained."

4. As stated in its preamble, the purpose of the Shipping Act, 1916, 46 U.S.C.A. §§ 801-842, 39 Stat. 728, is "To establish a United States Shipping Board for the purpose of encouraging, developing, and creating a naval auxiliary and naval reserve and a merchant marine to meet the requirements of the commerce of the United States with its Territories and possessions and with foreign countries; to regulate carriers by water engaged in the foreign and interstate commerce of the United States; and for other purposes."

5. The Shipping Act definition of "citizen of the United States" does not completely exclude alien participation in American shipping. If control is vested in citizens, aliens may own up to 49% of the stock of corporations operating in the foreign

808) makes it unlawful, without the approval of the Secretary of Commerce, "to sell, mortgage, lease, charter, deliver, or in any manner transfer" to any person not a citizen of the United States any vessel or any interest therein owned in whole, or in part, by a citizen of the United States and documented under the laws of the United States, or the last documentation of which was under the laws of the United States; subjects the vessel or any interest therein to forfeiture in case of a violation; and prescribes a criminal penalty for those who violate the requirements.[6]

The legislative history in notes 5 to 9 will be discussed below under the heading "Legislative History".

The prohibition against mortgages to aliens was first inserted in sec. 37 in 1918. It was explained by Mr. Alexander, Chairman of the House Committee on Merchant Marine and Fisheries, as follows (56 Cong.Rec. 8026):

"Not only sales and charters to foreigners, but mortgages to foreigners, without the consent of the Shipping Board, are made unlawful. This is because a mortgage has proved to be a common device by which foreign capital has sought to obtain control of American vessels."

The prohibition, now 46 U.S.C.A. § 808, was enacted along with the Ship Mortgage Act as part of the Merchant Marine Act of 1920.[7] While the Ship Mortgage Act was generally concerned with facilitating the private financing of vessels, its immediate objective was

trade and 25% of the stock of corporations operating in the coastwide trade. Also, in recent years there has been some relaxation of other requirements: e. g., in 1958 Public Law 85–902, 72 Stat. 1736, 46 U.S.C.A. § 883–1, permitted operation of certain vessels in the domestic trade by owners who did not qualify as citizens under the 1916 Act; and in 1959, Public Law 86–327, 73 Stat. 597, 46 U.S.C.A. § 802, relaxed the requirement for citizenship of corporation directors.

6. In the debates on the 1918 amendment, 65th Cong., 2d Sess., June 5–28, 1918, Cong.Rec. Vol. 56, pp. 8029, 8032, 8033, Congressman Saunders said, p. 8029: " * * * The amendment intends to make it impossible for any arrangement to be effected by which such a corporation, partnership, or association shall be a citizen of the United States, when the real control of same is in the hands of aliens. We have sought to make the language used so sweeping and comprehensive that no lawyer, however ingenious, would be able to work out any device under this section to keep the letter, while breaking the spirit of the law." Again, at p. 8029, Mr. Edmonds: "I would like to call attention to the fact that in the testimony of the attorney for the Shipping Board he called attention to the fact that some law firms in New York City who represented people abroad would buy a ship and all the stockholders would be the members of this law firm, the stock being held in trust for foreign clients. As I understand it, this is to get around that arrangement." Mr. Saunders: "It seemed to the committee that the plan referred to by the gentleman from Pennsylvania might circumvent the purpose of the original act. Hence the amendment to afford a remedy for a possible weakness in that act. * * * if such a scheme as the gentleman from Pennsylvania suggests, was sought to be worked out, it would not only be in fraud of the law, but would be inoperative, since it would be an arrangement by a contract, or understanding for the majority of the voting power to be exercised in behalf of some one not a citizen of the United States."

7. At the hearings before the Senate Commerce Committee on the Establishment of an American Merchant Marine, 66th Cong., 2d Sess., at p. 963, Senator Calder said: "If this mortgage is sold to an Englishman and the vessel is there, will not the English law govern, under the principle that the remedy follows the law of the place?

"Mr. Campbell: I do not know. * * *

"Senator Calder: * * * The reason I asked it is I have very large experience in making and assigning mortgages on real estate.

"Mr. Campbell: I have no objection to putting in this bill, if you want to, that no mortgage shall be assigned to an alien. That will meet your situation?

"Senator McNary: That is the only way you can meet it.

"Senator Calder: That is the only way you can meet it."

See also op. cit. p. 1042.

to provide a basis for financing the disposal by the Government of war-built tonnage authorized under the Merchant Marine Act of 1920.[8]

The legislative history of the Shipping Act, 1916, and of the Ship Mortgage Act, 1920, does not disclose any specific statement that Congress intended either to permit or to exclude investments by aliens in bonds issued under trust deeds secured by mortgages to citizen trustees. There are instances in the legislative history of the Ship Mortgage Act, 1920, however, indicating concern over vessels being transferred alien as a result of mortgages being held by aliens and the foreclosure of mortgages in foreign countries.[9]

The Ship Mortgage Act, as amended, is now codified as ch. 25 of Title 46, U.S.C., 46 U.S.C.A. §§ 911–984. Sec. 922(a) provides that a mortgage on a vessel of the United States shall have the status of a preferred mortgage if five requirements are met. The only dispute in this case is about the fifth requirement that the mortgagee be a citizen of the United States. It appears from the stipulation and the evidence that all other, formal requirements of sec. 922 have been met.

As noted above, sec. 911(5) provides:

"The term 'mortgagee', in the case of a mortgage involving a trust deed and a bond issue thereunder, means the trustee designated in such deed."

The foreclosure provisions of the Act are set out in secs. 951–954.

The provisions prohibiting transfer to an alien of any rights under a mortgage appear in sec. 961. Sec. 961(d) and (e) read as follows:

"(d) No rights under a mortgage of a vessel of the United States shall be assigned to any person not a citizen of the United States without the approval of the Secretary of Commerce. Any assignment in violation of any provision of this chapter shall be void.

"(e) No vessel of the United States shall be sold by order of a district court of the United States in any suit in rem in admiralty to any person not a citizen of the United States."

*Discussion*

1. *Ordinary Meaning of "Bond Issue"*

▮ The term "bond issue" is not defined in the Ship Mortgage Act. The

---

8. The development of the Ship Mortgage Act, 1920, and particularly of sec. 911(5) may be traced through the following legislative history: 66th Cong., 2nd Sess., H.R. 10378; S. 3882; modified H.R. 10378, following H–S conference; see also H.R. 1093, 1102, 1107; H.R. 12787, and Confidential Subcommittee Print of H.R. 12787.

9. These statements include, in addition to those set out in note 7:

"Senator Calder: Suppose I loaned money on an American ship and then I sold (sic) [mortgaged] that ship to a foreigner, and that foreigner foreclosed the mortgage. Would not that ship then pass into the control of the country of which he was a citizen?

"Mr. Campbell: I can not answer that question, for the reason that if he was going to foreclose and he foreclosed in the United States courts, under the terms of the Shipping Board act, he, a foreigner, might not be able to obtain a transfer of the flag. If he attempted to foreclose

the mortgage in England—I doubt whether he could foreclose that mortgage in England—under this bill, because jurisdiction for foreclosure is restricted to the United States courts, but if he did, he would not pass an indefeasible title, except in accordance with the procedure in this bill. I do not know whether he would acquire the right of transfer of the flag or not. * * *

\* \* \* \* \*

"Senator Calder: If this mortgage is sold to an Englishman and the vessel is there, will not the English law govern, under the principle that the remedy follows the law of the place?

"Mr. Campbell: I do not know; you have asked me a pretty big legal question; I can not answer. If you will give me as much time to prepare my answer as somebody did to prepare the question I will try to answer it."
(Hearings Senate Commerce Committee on the Establishment of an American Merchant Marine, 66th Cong., 2d Sess., pp. 960, 961, 963, 964 (1920).)

evidence does not clearly establish that in 1920 [10] or in 1962 [11] the term "bond issue" was commonly understood either to include or to exclude a private placement or private issue where there was only one bondholder. The terms "private placement" and "private issue" are sometimes used interchangeably; the evidence indicates that the term "private issue" is often used to include any issue where there are not more than ten bondholders.

Chemical has offered testimony that in the financial community the term "bond issue" is generally understood to include private issues and private placements whenever there is a trustee and a deed of trust with one or more bonds issued thereunder. The witnesses also testified that this was the generally accepted meaning in 1920. Their testimony is weakened, however, by the incredibly broad meaning two of the witnesses gave to the term, and by the fact that private issues and private placements were not so common in 1920 as they have become since the adoption of the Securities Act of 1933.

On the other hand, there is authority supporting Objectors' contention that the term "bond issue" ordinarily has a narrower meaning. The Encyclopedic Dictionary of Business Finance, Prentice Hall (1960), p. 73, defines "Bond Issue" to mean: "Class of bonds offered to the public at the same time. All the terms and conditions of the bond issue are set forth in the trust indenture". At the hearings on the 1954 Amendments to Title XI of the Merchant Marine Act, dealing with Federal Ship Mortgage Insurance, which will be discussed more fully below under the heading "Legislative History", Rudolph Hecht, Chairman of the Committee of American Steamship Lines, who was sponsoring the bill, said:

"The bond issue is really your second step. The shipowner or builder goes out and borrows $10 million in one lump, and it may well be that the Metropolitan Life, or John Hancock, or the New York Life, would be glad to keep the whole loan, and that is all there is to it.

"But on the other hand, if they fix a rate which is higher than some investment house would be willing to take it on for, and that investment house would then say, 'All right. I will give you the $10 million and you make it payable to a trustee and I will split it up into small units and sell some of it to pension funds, and some of it to savings banks, and some of it to the individual investors in thousand dollar pieces, and then it may become a bond issue.' It is entirely flexible." House Hearing on H.R.8637, p. 18, 83rd Cong., 2nd Sess. (1954).

The adjudicated cases do not furnish a clear definition. In Detroit Trust Co. v. The Thomas Barlum, 293 U.S. 21, 55 S.Ct. 31, 79 L.Ed. 176 (1934), discussing related problems under the Ship Mortgage Act, the Supreme Court said: "In placing ship mortgages upon a stronger basis as securities, the Congress had in mind, and expressly included, trust deeds securing issues of bonds to the public." 293 U.S. at 40, 55 S.Ct. at 37. The Court did not refer to private issues. On the other hand, in Moon Engineering Co. v. American Steamship Valiant Power, E.D.Va., 214 F.Supp. 555 (1963), Judge Hoffman held that the term "bond issue", as used in sec. 911 (5), is not limited to a "public" bond issue. Judge Hoffman quoted from The Thomas Barlum, but failed to refer to that portion of the opinion which is quoted above. The other cases cited by Chemical and by Objectors on this point are not particularly helpful.[12]

10. When the Act was passed.

11. When the mortgage was made.

12. Cf. Parsons v. City of Birmingham, 223 Ala. 610, 137 So. 665 (1931); Alabama Power Co. v. City of Scottsboro, 238 Ala. 230, 190 So. 412 (1939); Bell County v. Lightfoot, Attorney General, 104 Tex. 346, 138 S.W. 381 (Texas, 1911).

In McLouth Steel Corp. v. United States, Ct.Cl., 319 F.2d 167 (1963), a case not under the Ship Mortgage Act, but cited by Chemical in support of the proposition (with which this Court agrees) that the instrument held by Landesbank in this case is a bond, the Court of Claims, speaking through Mr. Justice Reed (Ret.), said:

"The presence of an indenture and trustee is commonly regarded as differentiating a bond from a promissory note. The latter is a two-party agreement, whereas the presence of a trustee brings a third party into the transaction. Promissory notes are ordinarily used 'when there is a private deal and only one or a very few investors.' Childs, Long-Term Financing 119. On the other hand, an indenture and a trustee are normally used in connection with an issue which is designed to be widely traded, in order to safeguard the rights of the many holders who are often unable effectively to protect themselves and to eliminate the necessity for a separate contract each time the bond is traded. Id., at 91–93; Guthmann & Dougall, supra, at 170–71, 176–77; Baker & Cary, Cases on Corporations 1016 (3d ed. 1959); compare Berle & Warren, Cases on Business Organization 862." 319 F.2d at 172.

■ The evidence in this case supports the conclusion that an indenture and a trustee are normally used where there are multiple bondholders, for the reasons stated by Mr. Justice Reed, but that a trustee may sometimes be provided for when there is only a single bondholder, if a trustee furnishes some practical, economic advantage to the lender. The Court has found as a fact that no such economic purpose dictated the use of a trustee in this case, but that a trustee was used in an effort to avoid the provisions of sec. 922(a) (5).

■ This Court concludes that the commonly understood meaning of the term "bond issue" is not so clear that the purpose of the statute and its legislative history can be ignored. The Court must construe the applicable statutes, in the light of their legislative history, the legislative history of related statutes, and administrative rulings over the years.

### 2. Purpose and Intent of the Applicable Statutes
#### a. Legislative History

It appears from the Ship Mortgage Act as a whole, from its legislative history and from the legislative history of the 1916 and 1918 acts, that when the Ship Mortgage Act was adopted in 1920 Congress was primarily interested in building up and preserving an American merchant marine. Congress wished to encourage the investment by United States citizens in United States flag vessels, by way of mortgage loans as well as by equity investment. It also wished the vessels to remain American vessels, available for use by the government in case of war or other emergency. Congress did not object to some foreign money being invested in a vessel, so long as such investment by aliens did not endanger the control of the vessel by the American investors; but Congress wanted to be sure that, if and when it might become necessary, the United States government would be able to control the use of the vessels. Congress was concerned about the actual control of the vessels; it was interested in legal title only so far as legal title involves control, and was interested in mortgages because they involve potential control.

These conclusions are supported by the provisions of the Shipping Act, 1916, the amendments thereto, and the Ship Mortgage Act, 1920, which are set out under the heading "Applicable Statutes", above.[13] They are also supported by the legislative history of the 1916, 1918 and 1920 Acts, cited under that

---

13. The purpose of those statutes was discussed at length by Judge Soper in

Meacham Corp. v. United States, 4 Cir., 207 F.2d 535, et seq. (1953).

heading and set out in footnotes 6 to 9 of this opinion.

The legislative history, particularly the comment of the Chairman of the House Committee on Merchant Marine and Fisheries that "a mortgage has proved to be a common device by which foreign capital has sought to obtain control of American vessels", and the comments set out in footnotes 7 and 9, show the concern which Congress had in the potential control which might be exercised by mortgagees.

The legislative history also shows that the principal purpose of sec. 911 (5) is to provide for a situation where there are many bondholders, who ordinarily are not in touch with each other.[14] Where there are numerous bondholders a trustee serves various useful functions, some of which are referred to in the reports and debates cited in footnote 14, and in the discussion under the heading: "Ordinary Meaning of 'Bond Issue'", above; see particularly the passage quoted from Mr. Justice Reed's opinion in the McLouth Steel Corp. case, 319 F.2d at 172. Where there is a single lender, there is seldom any reason for a deed of trust and the issuance of one or more bonds thereunder, unless the lender contemplates the possibility of selling or

transferring a part of his loan. That reason does not exist in this case.

Another purpose of sec. 911(5) may have been to prevent a possible forfeiture of the vessel under other provisions of the statutes, see secs. 808, 961(b), 961 (d), if some of the bonds, originally sold to citizens of the United States, should fall in the hands of aliens by inheritance, sale, or otherwise. This possibility is emphasized by a ruling made in 1924 by Chauncey G. Parker, General Counsel of the Shipping Board (the predecessor of Maritime), quoted below, which is the earliest administrative ruling cited or found.

### b. Administrative Rulings

In his 1924 ruling the General Counsel of the Shipping Board said:

"It could hardly be claimed that if negotiable bonds should be issued secured by a mortgage upon a vessel and one or more of the bonds should be assigned, the effect of such an assignment if legal would not vest in the assignee of the bond a right under the mortgage upon the vessel, because, as I understand the law, the debt secured by the mortgage is the principal thing and the mortgage is entirely incidental to

14. At the hearings before Congressional Committees on the Bills which resulted in the Ship Mortgage Act of 1920, there was repeated reference to the fact that bond issues were to be floated and that the bondholders would be numerous and scattered. See, e. g., report of the Hearings before the Committee on Commerce, United States Senate, 66th Cong., 2d Sess., relative to the Establishment of an American Merchant Marine, which shows, at p. 962, Senator Nelson said: "This is not like a mortgage to an individual. They contemplate that these mortgages be issued on bonds and sell the bonds to the public." At p. 963, Mr. Campbell, the former counsel for the Shipping Board, who had prepared the Bill for Congress, said: "This bill was drawn with two things in view. The first was in the hope that it might enhance the security value of a mortgage, so that it would be possible to scatter shipping securities

among all of the investing people." See also Hearings before the Committee on the Merchant Marine and Fisheries, House of Representatives, 66th Cong., 1st Sess., on H.R. 8422, August 27, 1919, pp. 4, 6, 102, 118, 146, 180, 186; Hearings before the Committee on the Merchant Marine and Fisheries, House of Representatives, 66th Cong., 2d Sess., on H.R. 9419 (revised H.R. 8422 and H.R. 8873), Part V, Friday, February 6, 1920, pp. 10, 11, 27–29, 44; 59 Cong.Rec. 9361; Hearings before the Senate Commerce Committee on the Establishment of an American Merchant Marine, 66th Cong., 2d Sess., at pp. 936, 938, 939, 944, 963; Hearings before the House Committee on Merchant Marine and Fisheries, H.R. 8873, 66th Cong., 1st Sess., Part III, at pp. 28, 31; Hearings before the House Committee on Merchant Marine and Fisheries on H.R. 9419, 66th Cong., 2d Sess., p. 52 (1920).

the debt so that while the debt may be assigned and such assignment would carry the mortgage secured by the debt, on the other hand the mortgage could not be assigned if the debt was not so assigned. Is it not therefore clear that Congress had in view the prohibition against an interest and a right under a mortgage being assigned either directly or as incidental to the assignment of the debt? It is easy to imagine that a person not a citizen of the United States might acquire all of the bonds secured by a mortgage. It would thus become the owner of the entire interests under the mortgage and obviously such a transaction is the very one which Congress sought to prohibit." [15]

A similar ruling was made in 1927.[16] The record indicates that these rulings remained in effect until 1949. In its brief, Maritime states: "As hereinabove indicated, there has been no change in the requirement of the Ship Mortgage Act that the mortgagee (including the trustee in the case of a trust deed and bond issue thereunder) be a citizen. This requirement, together with the provision prohibiting the assignment of rights under mortgages to non-citizens without approval and restricting the sale of vessels by the district courts in suits in rem in admiralty to citizens, are clear indications of the infusion into the 1920 Act of the policy of the Shipping Act, 1916, as amended, of isolating American-flag vessels from alien control. This policy appears to have been recognized as controlling in the two administrative rulings of the United States Shipping Board during the pre-1938 period * *. These rulings were that mortgage bonds issued under trust deeds constitute rights

under mortgages within the meaning of 46 U.S.C. § 961(d) and should not, therefore, be sold to non-citizens without approval. In effect it was ruled that bonds held by aliens were *prohibited* rights under mortgage unless approved. These rulings were of course made under circumstances then prevailing and could not have taken into account the governmental policy of facilitating private financing as an alternative to direct Government financing which later developed and came to the fore in the middle 1950s."

The last sentence refers to Title XI, dealing with Federal Ship Mortgage Insurance, which was added to the Merchant Marine Act, 1936, in 1938, and was amended in 1954 (see 68 Stat. 1267, 46 U.S.C.A. §§ 1273, 1274, 1276), and to various rulings and interpretations of the 1916, 1920 and 1936 Acts since 1938. The 1938 and 1954 statutes have been considered by the Court in this case, but the Court has also noted that the 1938 and 1954 statutes did not purport to amend the provisions of the 1920 Act which controls this case.

In the original enactment of Title XI in 1938 (52 Stat. 969), the term "mortgagee" was defined to include "the original lender under a mortgage and his successors and assigns approved by the [United States Maritime] Commission." [17] That definition of "mortgagee" continued until 1954, when the definition was changed to its present form, namely: "The term 'mortgagee' includes the original maker of a loan secured by a mortgage and his successors and assigns, except that in the case of a mortgage involving a trust indenture and an issue of bonds or notes thereunder, it means the trustee designated in such

15. Letter of January 2, 1924, from Chauncey G. Parker, General Counsel, addressed to Messrs. Squire, Sanders & Dempsey, The Leader-News Building, Cleveland, Ohio.

16. Letter of April 6, 1927, from Chauncey G. Parker, General Counsel, addressed to Messrs. Denegre, Leovy & Chaffe, 724 Whitney Central Building, New Orleans, Louisiana.

17. The report of the Committee on Merchant Marine and Fisheries states that this definition is "substantially the same as * * * in the National Housing Act." H.Rep.1950, 75th Cong., 3d Sess., p. 30 (1938).

trust indenture and his successors and assigns as trustee, but does not include the holders of the bonds or notes issued under such trust indentures; * * *." [18]

The purpose of the 1954 amendments to Title XI, including the change in the definition of mortgagee, was to stimulate *private* as opposed to *government* financing.

In its brief, the Government states that it has been unable to find in the legislative history of Title XI any specific statement that the Congress intended, in providing for trust indenture financing, either to permit or to exclude investment by aliens, but that there are statements indicating a desire for "a wide dispersion of these securities among the general public in all sections of the country." [19]

The rulings upon which Chemical and Maritime rely are cited in note [20]. They

---

[18]. In commenting upon the change in definition, the Senate Committee stated:

"Unlike the present law, the clean bill, as amended, seeks to encourage lending institutions to bring forth private funds through the medium of trust indentures, thus encouraging a broader basis of private financing." (S.Rep.1804, 83d Cong., 2d Sess., p. 5 (1954).)

This change in definition was discussed in the Hearings before the House Committee on Merchant Marine and Fisheries on H.R. 8637, 83d Cong., 2d Sess., on April 9, 1954. At these Hearings, Mr. Rudolph S. Hecht presented a prepared statement in his capacity as Chairman of the Committee of American Steamship Lines, which statement also represented the views of the American Merchant Marine Institute. In the technical comments attached to his oral statement Mr. Hecht commented on the definition of "mortgagee" as enacted by the 1954 amendment:

"In the case of most private financing there will be a trust indenture, under which securities will be issued, and a trustee which will be the mortgagee but will not be the lender. The definition of 'mortgagee' has been changed so that it includes such a trustee but excludes the holders of the securities." Hearings on H.R. 8637 before the House Committee on Merchant Marine and Fisheries, 83d Cong., 2d Sess., p. 12 (1954).

In response to a request by Congressman Allen to explain the changes being made in the existing law, Mr. Hecht and his counsel, Mr. Henderson, gave the following testimony at the hearings (p. 16):

"Mr. Allen: Why is it necessary to change it?

"Mr. Henderson: Why is it necessary to change it? Because you will not be able to issue securities to the general public through investment bankers, which is one of the things we hope to be able to do, without having the securities issued under a trust indenture with a corporate trustee in the usual form.

"Mr. Allen: I take it under this law there will be a situation very similar to the issuance of bonds by utilities and a variety of public issues of that sort secured by—

"Mr. Henderson: That is what we hoped to be able to have.

"Mr. Hecht: We are trying, Mr. Allen, to make that possible. We are trying, in other words, to open the money markets not only in one direction, let us say insurance companies or commercial banks, but we are trying to make it possible for investment bankers to come in and compete for some of this financing and market it in a way in which of course it has never been done before. That is one of the reasons why the trusteeship becomes so important. But we do believe, or at least some of us do, that it is possible to make a market for these securities among the smaller investors maybe in $1,000 lots; which of course is a new idea, but which would be a good thing for the merchant marine, in my opinion, because the more people that would have an interest in it, the better would be understood the problems of the industry." Op. cit. p. 16.

Geoffrey Azoy, a vice president of Chemical, said: "* * * all we are asking for is a type of security that we can sell to the public, because we are not going to hold many of them. They are going to be sold to the public, and what we want to try to do is get a package that is going to prove attractive to the public that we can sell". Op. cit. p. 59. See also pp. 18, 39, 41, 42, 56, 70.

[19]. S.Rep. 1759, 85th Cong., 2d Sess., p. 3 (1958).

[20]. a. The forms prescribed by Maritime and its predecessors under 46 U.S.C.A. § 838 for the purpose of disclosing the citizenship of mortgagees when offering mortgages for record, have limited their scope to the various types of mortgagees and have omitted reference to bondhold-

indicate that since 1949, and particularly since 1954, Maritime has taken the position that the citizenship of the trustee controls, and has generally either ignored the citizenship of the bondholders or stated that the citizenship of the bondholders is immaterial. Many of those rulings deal with ship mortgage insurance, where the provisions of Title XI, Merchant Marine Act, 1936, as enacted in 1938 and amended in 1954, directly apply. Some of them, however,

deal with the 1920 Act, which alone is involved in this case. The latter rulings ignore completely the 1924 and 1927 rulings and the contemporaneous construction and administration of the 1920 Act.

The rulings by the Bureau of Customs have simply given effect to the rulings made by Maritime. More importantly, it appears that the positions taken in recent years by Maritime have not always been consistent.[21]

ers under trust deeds. Maritime Commission's General Order 29, as amended, 4 Fed.Reg. 1621 (1939); Maritime Commission's General Order 61, 11 Fed.Reg. 4804 (1946); Maritime Administration's General Order 61, Revised, as amended, 16 Fed.Reg. 12997 (1951), 17 Fed.Reg. 295 (1952), 18 Fed.Reg. 7494 (1953); Maritime Administration's General Order 61, 2d Revision, as amended, 20 Fed.Reg. 1399 (1955), 20 Fed.Reg. 4131 (1955), 22 Fed.Reg. 9249 (1957), 23 Fed.Reg. 7587 (1958), 23 Fed.Reg. 7702 (1958), 24 Fed. Reg. 8465 (1959).

b. The regulations issued by Maritime under Title XI include the statement: "In the case of a mortgage or loan involving a trust indenture, the mortgagee or lender will be deemed to be a citizen if the trustee designated in such trust indenture, and his successors and assigns as trustee, if any, so qualifies as a citizen of the United States." Sec. 298.4(f), Maritime Administration's General Order 29, Revised, as amended, 23 Fed.Reg. 385 (1958), 24 Fed.Reg. 1464 (1959), 24 Fed. Reg. 10257 (1959), 26 Fed.Reg. 4428 (1961), 27 Fed.Reg. 1168 (1962). See also to similar effect the earlier Title XI regulation, Maritime Commission's General Order 29, as amended, 4 Fed.Reg. 1621 (1939).

c. The citizenship affidavit for trustee-mortgagee applicants in Title XI transactions prescribed by Maritime is confined to the citizenship of the trustee-mortgagee and omits reference to bondholders. Maritime Administration's General Order 89, 25 Fed.Reg. 5293 (1960).

d. In response to inquiries, Maritime has advised that the approval of Maritime was not required under 46 U.S.C.A. §§ 808, 835, for the owner to place a mortgage on a vessel documented under the laws of the United States where the mortgage involved a trust deed and a bond issue thereunder and the trustee but not the bondholder was a citizen of the United States. Also, the Chairman, United States Maritime Commission, stated to the Acting Commissioner of Customs that pursuant to 46 U.S.C.A. § 922(a) (5) the citizenship of a trustee named in a deed of trust securing a bond issue is determined (for the purpose of determining its eligibility as a preferred mortgage) by applying the requirements of 46 U.S.C.A. § 802, and such citizenship is not affected by the ownership of bonds secured by such mortgage.

e. The regulations of the Bureau of Customs in dealing with the recordation of preferred mortgages contain no requirement for determination of citizenship of bondholders under trust deeds. 19 C.F.R. 88 (1964).

f. In response to inquiries the Bureau of Customs stated in effect that the citizenship of the trustee and not of the bondholder or bondholders is controlling in the determination of the preferred status of mortgages for recording purposes under the 1920 Act.

g. Maritime has issued no regulations for the approval of the issuance or transfer of bonds to non-citizens as rights under mortgages under 46 U.S.C.A. § 961 (d).

h. Maritime has insured numerous mortgages involving trustees, some with public issues of bonds and some with private issues of bonds without any determination of citizenship of bondholders.

21. For example, on May 20, 1959, in connection with the vessels Wang Buccaneer and Wang Importer, Maritime's General Counsel gave his opinion that if the citizen holder of a mortgage and mortgage notes assigned the mortgage to a citizen trustee and the notes to an alien, with the understanding that a trust indenture would be entered into between them, the arrangement would amount to the acquisition by an alien of a direct interest in the vessel, forbidden by secs. 808 and 835. On June 10, 1959, he stated that Maritime's approval would not be necessary if the outstanding mortgage were

Chemical and Maritime argue that great weight should be given to the present administrative interpretations, rather than to the earlier interpretations. The rule, however, is that administrative practice has greater weight when it involves a contemporaneous construction of a statute, because the men charged with the responsibility of setting its machinery in motion were in a good position to know the congressional purpose. A subsequent reversal would not be entitled to such weight, especially if different personnel make the later interpretation.

Norwegian Nitrogen Products Co. v. United States, 288 U.S. 294, 315, 53 S.Ct. 350, 77 L.Ed. 796 (1933); United States v. Amer. Trucking Ass'ns, 310 U.S. 534, 549, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940). See also Note, Judicial Review of Reversals of Policy by Administrative Agencies, 68 Harv.L.Rev. 1251, 1257 (1955); Power Reactor Development Co. v. Electricians, 367 U.S. 396, 408, 81 S.Ct. 1529, 6 L.Ed.2d 924 (1961); United States v. Atlantic Refining Co., 360 U.S. 19, 24, n. 4, 79 S.Ct. 944, 3 L.Ed.2d 1054 (1959). This is not a case where the agency's interpretation has been consistent throughout.

discharged of record, and a trust deed executed with a citizen trustee and bonds issued to the alien. However, on July 31, 1959, the General Counsel advised the Commissioner of Customs, in connection with a proposed mortgage to a trustee securing one note to be held by an alien, that the transaction did not require approval, and that the May 20, 1959, letter was based on the particular facts and circumstances of that case, and was not intended to apply generally to all cases involving trust indentures and notes issued thereunder. It does not appear that Title XI, dealing with insurance, was involved in either case.

22. In Brock, the Bank of Nova Scotia sought a preferred lien for advances by it to a shipowner to meet payments on a first preferred ship mortgage held by Manufacturers Hanover Trust Company. As an alternative basis for denying the preferred status, the court stated as follows:

## c. Questions Presented, and Statement of the Ultimate Question to be Decided

If the earlier administrative rulings were correct, a bond is a right under a mortgage, and cannot legally be transferred to an alien without the approval of the Secretary (acting through Maritime). A fortiori, the original issue of a bond to an alien would also require such approval. It is true that in the Valiant Power, supra, Judge Hoffman stated: "In the language of § 911(5), Congress did not suggest that the bond would be invalid if it fell into the hands of persons who do not qualify as citizens under § 802." 214 F.Supp. at 558. It does not appear, however, that Judge Hoffman was asked to consider or did consider the 1924 and 1927 rulings of the General Counsel. Nor does it appear that they were cited to or considered by Judge Solomon in his dictum in Brock v. S. S. Southampton, 231 F. Supp. 278, D.Ore. (1964).[22]

It is not necessary to decide in this case whether the transfer to an alien of one or more bonds originally issued to a citizen of the United States requires the approval of the Secretary. That is the question which would affect the market-

"[The Bank of] Nova Scotia is a citizen of Canada. The Ship Mortgage Act of 1920 provides that a preferred ship mortgage may only be held by a United States citizen. 46 U.S.C.A. § 922(a) (5). The act further provides that the assignment of rights under a preferred ship mortgage to a non-citizen may be accomplished only with the approval of the Secretary of Commerce. 46 U.S.C.A. § 961 (b). Nova Scotia could have arranged an assignment of rights under Manufacturer's mortgage to a United States citizen-trustee. This would have entitled it to a beneficial interest in Manufacturer's mortgage.

\* \* \*

"Where Congress has provided for a specific method or methods by which a non-citizen may protect its interest and gain preferred status, a non-citizen will not be entitled to the benefits of the Act without complying with its provisions."

ability of the bonds, about which Chemical and Maritime express concern. But that is not the question in this case. The question here is whether Congress intended the term "bond issue", as used in sec. 911(5), to cover the case of a single lender, an alien, and a trust indenture which gives that alien lender, as the holder of the only bond issued under the indenture, a considerable measure of potential control over the operation of the vessel.[23]

### d. Conclusion

The provisions of the mortgage indenture in this case, summarized in the statement of "Facts", above, show that although Landesbank did not have all of the powers which an ordinary mortgagee would have, it did have a considerable measure of potential control. How great a measure of potential control Landesbank had would depend in part upon when and where and under what circumstances Landesbank would attempt to exercise it. A German admiralty court or an admiralty court in some other country might feel that the interests of the lender, the sole bondholder, the equitable mortgagee, should not be limited by the interests of the United States.[24] Certainly, the legislative history quoted in the notes shows that Congressmen in 1920 were worried about this possibility. Although, as Chemical and Maritime argue, some of the general objectives sought by Maritime and by Congress may have changed over the years, that does not justify a change in the proper construction of the 1920 statute; nor indeed does it indicate that Congress has lost its concern over the potential control of the vessels by foreign mortgagees, which

is so apparent from the legislative history. Congress has never amended the controlling provisions of the 1920 Act.

The foregoing considerations compel the conclusion that Congress did not intend the term "bond issue" in sec. 911(5) to include the private issue of a single bond to a foreign lender, who could not qualify as a mortgagee under sec. 922(2) (5). Even if the literal meaning of sec. 911(5) were clear, which it is not, it has long been the law of the Fourth Circuit that the literal interpretation of a statute is not permissible if it leads to a result the Congress could not have intended. United States v. 21 Pounds, etc., 4 Cir., 147 F.2d 78, 83 (1945).

In Meacham Corp. v. United States, 4 Cir., 207 F.2d 535 (1953), cert. granted 347 U.S. 932, 74 S.Ct. 631, 98 L.Ed. 1083 (1953), dismissed per stipulation 348 U.S. 801, 75 S.Ct. 17, 99 L.Ed. 633 (1954), the Court, speaking through Judge Soper, prevented the circumvention of the purpose of secs. 802 and 808 by refusing to approve a device which, although within the letter of the Shipping Act, violated its intent and spirit. In the present case, Landesbank and Chemical have attempted to circumvent the intent and spirit of the Ship Mortgage Act.

This Court concludes that the proper construction of the relevant statutes, in the light of their legislative history and of applicable legal principles, does not permit a foreign lender to obtain preferred status for his mortgage by the device used in this case. Properly construed, the statutes do not grant preferred status to the mortgage from Seatrade to Chemical, Trustee.

---

23. It is not necessary to decide whether the term "bond issue" is generally understood to include or not to include "private issues", as the latter term was defined by Chemical's witnesses. The answer in each case would require a consideration of the entire transaction, including the terms of the trust indenture. Nor is it necessary to decide whether the various rulings by Maritime and Customs with

respect to insurance, recording, etc. are correct.

24. E. g. Landesbank might seek to avail itself of the provisions of sec. 4.2 of the indenture, quoted under "Facts" above, which specifically permitted Landesbank to bid for and purchase the vessel. This was one of the points which Congress had in mind in the 1920 debates. See notes 7 and 9, above.

The Court therefore holds that the mortgage from Seatrade to Chemical, Trustee, is not a preferred mortgage under sec. 922, entitled to the preferred status given by sec. 953.